In the Matter of Joseph E. Seagram & Sons, Inc., Appellant, *v.* Tax Commission of the City of New York et al., Respondents.

First Department, March 5, 1963.

*Seymour M. Klein* of counsel (*Edward H. Helmke* with him on the brief; *Lynton, Klein, Opton & Saslow,* attorneys),· for appellant.

110

*James J. McGowan* of counsel (*Edward J. McLaughlin* with him on the brief; *Leo A. Larkin, Corporation Counsel*), for respondents.

STEUER, J.   The appeal is from an order confirming the assessments for tax purposes for the tax years 1956–57 to 1961–62, inclusive, on the real estate located at 375 Park Avenue. At the outset it is well to bear in mind a fundamental distinction between a proceeding of this character and one to ascertain the value for the purposes of condemnation.   In the latter proceeding the court is obligated to find the value of the property.   In this proceeding the value need only be found if the petitioner shows that it is less than the value fixed by the appraisers.

·Considering first the land values, these progress ·from $3,800,000 in the earliest year to $5,000,000 in the latest.   The present owner acquired the greater part of the land in 1951 for $4,000,000.   The balance, consisting of an adjacent plot on East 52nd Street, was acquired in 1955 for $900,000.   It is not disputed that between the time of purchase and the years under review real estate values have been steadily rising.   Under the circumstances, an attack on the assessments for the land could not succeed without a showing that the price paid was grossly excessive.   The petitioner has sought to do this by two means: through the medium of comparative sales, and circumstances attending its own purchase of this land.   As to the latter, it is not subject to dispute that petitioner is a large corporation with experienced executives and had occasion to supplement its own knowledge with capable real estate advice.   It makes no claim that it was overreached by the sellers.   What it does assert is that in 1950 its lease on the office space it occupied was about to expire and that necessity prevented it from making a bargain at realistic prices.   The leisurely pace at which the acquisition proceeded was quite enough to allow Special Term to give little credence to this explanation.   The testimony in regard to comparative sales was far from conclusive and, as against the sale of the property under review, carried practically no weight.

The building in question is an unusual one in its nature, though not unique.   It has these distinctive features which are the hallmarks of its class:  It is generally known by its name (having relationship to the owner) instead of a street address; it is constructed of unusual and striking materials; its architecture is noteworthy; and it is well set back from the streets on which it fronts, the space involved being employed in distinctive decorative effects.   The net effect is that this building, **and the limited number that resemble it**, gives up a substantial fraction of the land that might be built upon, with a consequent

diminution of the rentable space, and its construction involves a cost materially in excess of utilitarian standards.

These buildings serve their owners in a fourfold way: 1. They house their activities. 2. They provide income from the rental of the space not used by the owner. 3. They advertise the owner's business. 4. They contribute to the owner's prestige.[1]

Just how a building whose construction is designed to serve these particular purposes is to be appraised, presents certain difficulties. The enhancement of the owner's ego is not a factor that can have a market value. In this city at present buildings in this special category, though few, are not unique. The time may come when they are so numerous that they become subject to sale, rent and the other transactions of commerce, so that by trading a market price which reflects the extracommercial aspect can be ascertained. Meanwhile in this proceeding it must first be determined whether a valuation based on the special character is necessary. It would not be necessary if the building, as a conventional office building, is of a value at least equal to the assessments.

The assessments for the last three years are the only ones in question. There is little material difference in the relevant figures, so a calculation for a single year will suffice to make the determination based on capitalization of net income. For the year ending July 31, 1960, the actual income was $3,005,510. This does not include any income for the space occupied by the owner. Petitioner's expert appraised this space as having a rental value of $927,850, giving a total income of $3,933,360. Petitioner further claims a vacancy allowance of 5%, which would not be unreasonable. The net estimated return would therefore be $3,735,692. Expenses would vary somewhat. Petitioner's average for the three years is $1,401,000. This includes an item of $288,000 in each year for tenant changes. The city has taken the position that this item is not allowable because the improvements are personalty and not a part of the realty, relying on *Matter of 666 Fifth Corp.* v. *Tax Comm. of City of N. Y.* (11 N Y 2d 915). We find the argument inappropriate. The figure represents a maintenance charge. Whether it has

1. In this connection they exemplify a well-known economic theory (see T. Veblen, The Theory of the Leisure Class). Though the author did not foresee this particular manifestation of his " Doctrine of Conspicuous Waste ", it comes well within the specifications he provides for its successful application: " In order to impress these transient observers * * * the signature of one's pecuniary strength should be written in characters which he who runs may read. It is evident, therefore, that the present trend of the development is in the direction of heightening the utility of conspicuous consumption as compared with leisure." (Modern Library ed., p. 87.)

to do with realty or personalty is immaterial. We question the figure on a different ground. Petitioner, having the burden of proof, must justify its calculations. The record is not clear as to how the expert estimated this figure, nor what it includes. It may be gathered that the figure is the total expenditure on behalf of tenants amortized over a period of years — just what period is by no means certain. But the record does show that it includes expenditures of sums which might be considered so far beyond the range of ordinary tenant accommodation in a commercial venture as to be considered fantastic. Expenditures in excess of a million dollars went into the fitting of a restaurant. Some explanation would be required to show that these amounts were proper business charges and that there was a reasonable expectation that rents would be enhanced or made possible through them. In the absence of any attempt at justification, they must be rejected. This reduces the expenses to $1,113,000 annually, with a net income of $2,623,000 (figure rounded out). Using petitioner's capitalization figures for the land and the taxes thereon there is a residual income for the building of $2,186,000. Petitioner claims the proper capitalization rate is 8% (made up of 6% for income and 2% for depreciation) plus taxes. Aside from the claim, this rate is not supported, and the city offered no proof on the subject. These figures represent the conservative view of an investor's expectations and, while they might be subject to revision in the special circumstances here presented, the record is barren of any proof upon which any lesser rate might be adopted. Using these figures, the value of the building would be $17,802,000. While this exceeds the petitioner's estimate by almost $4,000,000, it is still $3,200,000 under the assessment, and only about half the actual cost of construction.

It would seem to follow beyond the hope of successful contradiction that the traditional method of ascertaining value by capitalization is not applicable in this situation. Nowhere in the record is it explained how just two years before the period under review an experienced owner employing a reliable contractor and having the services of outstanding architects put $36,000,000 into a structure that was only worth $17,800,000. Such a startling result requires more than speculation before it can be accepted as fact.

The conclusion, therefore, is that petitioner proceeded upon an untenable theory and failed to show error in the assessments which calls for affirmance of the confirmation by the Referee. It would, however, be unfair to leave the impression that a building of this sort presents an insoluble problem and that

the owner is never in a position to contest the assessment of the city's appraisers. Nor is it necessary to await the day when the number of buildings of this kind reaches a point where they can be determined to have a market or rental value in consonance with their special features. Naturally, determination will have to await a proper presentation of the issue, but it will not be idle to indicate the lines along which presentation might be made.

Two possible theories occur. The first, and perhaps more obvious, is that advanced by the city here, namely, replacement value — reasonable cost of construction less depreciation. To date this method of appraisal has been limited to two situations, in both of which the logic of its use is impregnable. The first is where the building is unique and would, if destroyed, have to be replaced (*People ex rel. N. Y. Stock Exch. Bldg. Co.* v. *Cantor,* 221 App. Div. 193, affd. 248 N. Y. 533). The second situation is where the owner claims it as the highest value which can be put on the building (*Matter of 860 Fifth Ave. Corp.* v. *Tax Comm. of City of N. Y.,* 8 N Y 2d 29). Neither of these categories embraces the issue here. But an approach to that method of valuation may be found through them. Buildings that are unique through their design for a special purpose which not only serves that purpose but renders them unsuitable for any other use are unsalable if the owner is the only one engaged in that enterprise or the number of persons is so few that the practical effect is the same. Likewise, the owner cannot replace the building by purchase. Consequently its value to him is the cost of replacement. Buildings so specialized as to have a restricted use, that is, a use by a limited number of people, are appraised similarly where there is an absence of proof of what such buildings sell or rent for (*Matter of City of N. Y.* [*Kramer Realty Corp.*], 16 A D 2d 148). While here the special features do not restrict the use, they do affect the value and the absence of proof of that effect could well lead to a valuation on replacement value as a last resort.

Another approach would be through the rental value of the space occupied by the owner. We have seen that the peculiar feature of this building and the few that resemble it is the identification in the public mind of the magnificent structure, and the consequent effect it has on the æsthetic improvement of the neighborhood, with the owner. The public does not know or care about the actual ownership of the fee. The same effect could be produced if the building were identified in the public mind by the name of a tenant. In calculating the income of the building the additional increment that a tenant who could afford and would be willing to pay for such a privilege should be

included. This increment could be added to the estimated rental of the owner-occupied space. Having determined this figure, capitalization of the result should produce a scientific appraisal.

The order should be affirmed, with costs.

BREITEL, J. P. (concurring). I concur in affirmance of the order. I also agree with the views expressed by Mr. Justice STEUER concerning the land value assessment and the so-called tenant-changes. It is with respect to the building value assessment that I find it necessary to express my own views.

Taxpayer has argued cogently that the value of the building should be determined in the usual way by capitalization of the net income, using 6% as the rate of capitalization and 2% as the rate of depreciation. The 6% rate of income capitalization, the only rate proven in the case, is a modest, presumptively proper, return in the absence of any proof that financial and real estate market conditions justify a lower rate. A commercial building is an investment that is being amortized and it is unlikely that a prudent investor would regard anything more than 50 years as a conservative basis on which to gamble physical depreciation, technological obsolescence, area deterioration, or other physical devaluation (American Inst. of Real Estate Appraisers, The Appraisal of Real Estate [3d ed.], ch. 14, especially pp. 204–205; 1 Bonbright, Valuation of Property, ch. X). Hence, the 2% rate, in the absence of proof to the contrary, would seem reasonable. Because of the leverage in rates of capitalization and amortization one must be especially cautious before adjusting them, and, in no event, should it be done without objective basis in the record (cf. *Matter of City of New York [A. & W. Realty Corp.]*, 1 N Y 2d 428, 433).

The recent cost of construction of this building stands out, however, as a seeming contradiction of the result derived by capitalization of net income. It is because of this that the city has attempted to resolve the problem by the concept of a limited specialty — and to base value on replacement cost less depreciation. At this point it is not necessary to reach that hurdle.

It has been held with respect to new buildings that the cost of construction is a highly significant indicator of value (*Matter of 860 Fifth Ave. Corp.* v. *Tax Comm. of City of N. Y.,* 8 N Y 2d 29, 32; *Matter of 5 East 71st St.* v. *Boyland,* 7 N Y 2d 859; but, cf., *Matter of City of New York [Maxwell]*, 15 A D 2d 153, 171; see Bonbright, *op. cit.* ch. VIII, especially pp. 144–145). Thus, in *Matter of 860 Fifth Ave.,* it was said by Judge VAN VOORHIS, on behalf of the court (p. 32): " Cost of new

buildings or reproduction cost less depreciation establish maximum building value in assessment cases [citing cases]. It can have no other relevance unless the building would normally be reproduced at the time in question. One may regard that formula as supplying some evidence of value, however, where, as here, the building is well suited to the site. The actual construction cost in 1949–1950 was properly considered as a factor. The tax years now in litigation followed soon after the construction of this building, and both the assessors and Special Term found the same building value as well as the same land value during each of the tax years in suit.''

The present case provides a stronger one for application of this rule, for here the court is concerned with the year of completion and the immediately following years. In *Matter of 860 Fifth Ave.*, the court was concerned with four tax years (1954–1958) separated by five years from the time of completion (1949–1950).

Given a profit-minded owner with available experience and resources, and a competent builder, the cost of construction is likely to represent the value of the newly-finished product. Consequently, in the absence of credible qualifying explanation, for a new building the cost of construction is, prima facie, the true value. Indeed, because it would escape this fact, the taxpayer is in the anomalous position of urging that vast corporate funds were used to construct a building of much less value. This, if so, is never satisfactorily explained and does not do much credit to the sagacity of the corporate managers.

The maximum assessment for the building for the years in question was $21 million. The building, according to the city's examination of the taxpayer's books, cost $36 million to complete. Even if one were to eliminate the cost of all tenant improvements at taxpayer's figure of $9.5 million, contrary to what has already been concluded with respect to tenant-changes, there would be a residue of $26.5 million. Taxpayer's expert, without knowledge of the actual costs, gave $19 million as the reproduction cost of the building before depreciation, excluding all tenant installations. Adding only a part of the cost of the tenant installations it would match the assessment; adding all the tenant installations the cost would exceed the building assessment generously. Interestingly enough, the taxpayer's expert, despite his lower cost figure, had only praise for the competence of the architect, engineers, and builders of this building. Consequently, in the absence of any satisfactory explanation to show excessive costs, the construction cost estab-

lishes value, prima facie — a value substantially in excess of the building assessment.

But the discrepancy here between capitalized rental income and cost of construction merits further analysis. The capitalized rental income as computed by taxpayer, using 6% as the rate of capitalization and 2% as the rate of depreciation, but including as an amortized expense the rejected tenant-changes, is $14.5 million. Excluding adjustments for tenant-changes the result would be $17 million — $4 million short of the building assessment, and up to $19 million short of the construction cost. Given a new building, prudently constructed for commercial purposes, the answer must be that the rental value assigned to the owner-tenant is too low, and, perhaps too, that the building as a whole bearing the name of its owner includes a real property value not reflected in commercial rental income. Of course, this would mean that, to begin with, the owner did not build for commercial rental-income purposes alone, and, as a consequence, capitalization of such income without adjustments produces a false result. Of course, the formula for capitalization of commercial rental income is relevant when commercial property is held only for such income, or when its market value is determinable solely by its potential for such income. This is merely a corollary of the principle that income capitalization is valid only for property held for or measurable only by its income (*Matter of City of New York* [*James Madison Houses*], 17 A D 2d 317, 319–320, 323; *People ex rel. Gale* v. *Tax Comm. of City of N. Y.*, 17 A D 2d 225, 230). In short, when dealing with commercial property one must not confuse investment for commercial rental income with investment for some other form of rental value unrelated to the receipt of commercial rental income.

It is self-evident that an owner who builds, as did this taxpayer, a prestige (monumental) building for itself, requires the leasing to other commercial tenants simply as an important way of bearing the heavy costs involved. The prestige building has a rental value not based alone on commercially rented space, but on the building's value in promoting the economic interests of an owner. Thus, such an owner is not wasting assets. Rather, it is investing in a real estate project that will contribute to the production of income in its principal enterprise. Since this practice is becoming a common feature of urban areas, such investment has ceased to be idiosyncratic and is undoubtedly translatable into market value terms. Typically, such value would be related to owner-occupancy of principal or prestige offices with choice space, the continued power

to control its choice of space, and most often, identification by name of the building with that of the owner.[2]

On this view the rental value assigned to the taxpayer's space is understated, if there is merely charged to that space the pro-rated value assigned to other tenants. And, undoubtedly too, there is value to be assigned to the building as a whole, independent of commercial rental income, since the building, qua building, is also held for business purposes, unrelated to the receipt of commercial rental income.

At this time, it is not necessary to work out the values last discussed, so long as, the building being new, the cost of construction, otherwise unexplained, suffices to justify the building assessment. With the passage of time both the taxpayer and the city will have, with respect to future assessments, the burden of providing proof and testimony bearing on such values. If there is sufficient evidence of market values, that may do. If not, reproduction cost less appropriate adjustments may have to be utilized to find the value of so much of the property as definably is not held for commercial rental income purposes — perhaps with the present ratio between adjusted original cost and capitalized commercial rental income as a starting point. In this connection it would be likely, although not necessarily so, that the prestige or monumental value of the building would depreciate economically at a much greater rate than the value attributed to the rental income potential.

It is unlikely, however, that a formulation based upon the physical ratio of owner-occupied space to commercially rented space would be valid. The reason is simply that an owner's quantitative need for space may be wholly unrelated to the economic value to it of the building as a whole, either as a prestige monument or as the seat of power to control the choice and use of space.

Worth discarding, although urged, is the argument that because a building does not occupy all of the assembled land, there is an inadequate improvement. This does not follow. The improvement is inadequate to the land only if that is not a sound economic way to construct a building. Indeed, a discernible trend in modern prestige building, for at least a quarter of a century, may make construction to the building line an inade-

---

2. Where, as sometimes happens, a major tenant's name is borne by the building, presumably, the rental paid reflects the name-bearing value. Or, in another situation, it may be that the tenant's name is used to enhance the prestige of the building; but in that case the rental income of the other tenants will reflect that value. The permutations are many, and whether the increased value attaches to the real estate or to business good will may well, in some cases, present problems difficult of solution.

quate improvement — economically. Exclusively utilitarian construction may produce more "rentable" space, but not more valuable space.

BREITEL, J. P., VALENTE, STEVENS and EAGER, JJ., concur in result and concur with STEUER, J., with respect to land value assessments and treatment of tenant-changes; BREITEL, J. P., concurs in opinion, in which VALENTE and EAGER, JJ., concur.

Order, entered on May 8, 1962, unanimously affirmed, with $20 costs and disbursements to the respondent.