**FEDERAL RESERVE BANK OF MINNEAPOLIS, Relator,**

**v.**

**STATE of Minnesota, Respondent,**

**County of Hennepin, Respondent.**

**No. 81–357.**

Supreme Court of Minnesota.

Dec. 17, 1981.

620

Dorsey, Windhorst, Hannaford, Whitney & Halladay, John D. Levine and James B. Lynch, Minneapolis, for relator; Johnson & Eastlund and Ralph W. Peterson, Minneapolis, of counsel.

Warren Spannaus, Atty. Gen., and James Neher, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, Thomas L. Johnson, County Atty., Minneapolis, for respondents.

## OPINION

SIMONETT, Justice.

Relator Federal Reserve Bank of Minneapolis seeks review by certiorari of an order of the Tax Court, claiming that the assessment of its property is based on an excessive market value, that the bank was denied equal protection under the federal and state constitutions, and that certain portions of the bank building devoted to "subtreasury" functions should be immune from real estate taxation. The Tax Court denied the bank's claims and we affirm.

The property involved is the Federal Reserve Building, constructed in 1973, an architecturally dramatic structure located at the northeast end of the Nicollet Mall at Washington Avenue in downtown Minneapolis. For the 5 tax years involved, 1974 through 1978, the property was appraised by the city assessor at a market value of $29.6 million, resulting in real estate taxes ranging from $1.6 million payable in 1975 to $1.4 million in 1979. The bank contends that the market value of the property should be between $12 and $15.4 million for the years in question.

This divergence in opinion of market value occurred because the assessor considered the bank building to be a "special purpose" building and thus relied on the reproduction cost assessment method in his appraisal. Relator's two experts, on the other hand, considered the building's most probable use to be a general office building and thus relied primarily on an income appraisal approach.

The bank building was specially designed to house all the operations of the Federal Reserve Bank for the Ninth Reserve District, and it cost approximately $30 million to build.[1] Approximately 60% of the building's 541,459 square feet of space is below ground level, consisting of three levels for parking, delivery facilities, vault, money storage and accounting areas. Rising above an open granite-floored plaza is an 11-story

1. The building was delivered to the bank as a turnkey operation for $30.1 million. The bank estimated construction costs at $29.8 million. Architect's and consultant's fees raised the total cost to over $34 million. The Tax Court's figure of a $29.8 million cost is fully supported by the evidence.

office tower. The office section is suspended from supporting towers at either end of the structure, and its distinctive catenary design allowed the office and underground floors to be constructed free of any supporting columns. In addition to the building's innovative overall design, numerous expensive special features are incorporated into the structure. The basement floors are constructed of heavy concrete to support pallet trucks and coin storage. A three-story vault (a building within a building), high-security devices, and a large, secured area for delivery of money are included in the basement levels. Low-maintenance ceramic tiles are used extensively throughout the building. The office tower contains a heliport and a firing range; extra structural and mechanical features are incorporated to allow later additional vertical expansion.

The parties stipulated that the value of the land was 1.95 million and that there were 442,197 square feet of rentable space in the building. The area in which the building is located, known as Gateway Center, is a newly-developed area approximately 4 blocks from the center of downtown Minneapolis. The surrounding buildings, including the Northwestern Life headquarters and the Minneapolis Public Library, are primarily single-function, owner-occupied buildings, with little or no commercial space.

The building was assessed by John Taylor for the City of Minneapolis with the assistance of John Krueger from the State of Minnesota. Taylor determined that the bank was a special purpose property, and although he considered both the comparative sales and income approaches in determining market value, he relied, in the end, exclusively on the "reproduction cost" method. Starting from the cost of the construction in 1973, Taylor calculated the inflation and depreciation factors, subtracted several million dollars' worth of unique bank facilities from the total, and deter-

mined the market value at 27.6 million for each assessment year.

The bank produced two differing appraisals at trial, both of which were substantially lower than the assessor's. Appraisers Howard Shenehon and Berge Hansen weighed the three traditional approaches in determining market value, and they set the market value between $12 and $15.4 million, although the building had been constructed for about $30 million. In their calculations, the two appraisers evaluated the building as a general office structure, and considered many of the building's expensive features to be "functionally obsolete" and so of no economic value to a hypothetical buyer. Thus, in using the reproduction cost method, Shenehon estimated the cost of replacing the square feet of rentable space, excluding such items as the catenary construction, the heliport, the granite plaza, the oversized footings and the vault space, and came up with values ranging from $12.7 to $15.2 million. The bank's appraisers arrived at the same range of values in using the income approach. Since they assumed that the most probable buyer would use the building as a general, multi-tenant office building, their estimates of the building's income value were substantially lowered by the building's distance from the central downtown intersection and from the commercially-significant skyway system.

The Tax Court made a finding of fact that "[t]he subject property is unique special purpose property," and affirmed the assessor's market value of $29.6 million.

I. The first issue, then, is whether the Tax Court's finding that the Federal Reserve Bank was a "special purpose building" was clearly erroneous. We hold it was not.

1. Special purpose property is property that is treated in the market as adapted to or designed and built for a special purpose.[2] This definition combines

---

**2.** A real estate treatise accepted as authoritative by all parties defines special purpose property as:

A property devoted or available for utilization for a special purpose, such as a clubhouse, a church property, a public museum, a public school, and so on. It also includes

both functional and structural aspects: a special purpose property becomes such either by its use for unique functions or by its distinctive, specially-designed structural details. The tax treatment of special purpose property is atypical and follows directly from this definition. Because the building is specially adapted to a unique use and will not readily be sold to another user, "[t]he very nature of special purpose property is such that market value cannot readily be determined by the existence of an actual market, and therefore other methods of valuation, such as reproduction cost, must be resorted to." *McCannel v. County of Hennepin*, 301 N.W.2d 910, 924 (Minn.1980). *McCannel*, our leading case on this question, states that an airport facility should be valued according to its reproduction cost, rather than by its value to a hypothetical buyer who could use the facility only as a warehouse.

The city's assessors considered it significant that the property in this case was built to fulfill certain needs of the owner and that the building was not the type of property bought or sold frequently on the market. Thus they assumed that the only hypothetical buyer would be essentially the same as the current user, the Federal Reserve Bank. The Tax Court accepted this analysis. This court's observation in *McCannel* is pertinent: "The fact that [the airport facility's] intrinsic value to Northwest Airlines might be equal to its value to a hypothetical buyer as an airport facility does not render the trial court's method of valuation invalid." *McCannel*, 301 N.W.2d at 924–925.

■ 2. It seems to us that the property in this case is a special purpose building, specifically designed to meet the needs of the bank. Many of the functions performed in the bank require regular office space (located in the office tower, comprising 40% of the building's area), but the safe-keeping and currency and coin opera-

other buildings having value, such as hospitals, theatres, breweries, etc., which cannot be converted to other uses without large capital investment.

tions require special design and protective features. Thus, while only 15% of the building's area is devoted to unique facilities that could never be used by a general office tenant, at least 60% of the building (the entire lower portion) was built differently than if it had been designed as an office building. Moreover, even though the office tower is similar to ordinary office buildings in some aspects, certain features, such as expansion potential, the firing range and high-cost materials, were specially required by the bank. The bank argues that most of the building, nevertheless, could be converted to general office space or related facilities without substantial modification or large capital expenditures. Thus it points out the firing range space could be rented for storage and most of the underground space could be made over to office space. This may be true; one can always "make do" with what one has, yet such use is hardly desirable nor is it what the owner had in mind when the building was designed. For example, the bank acknowledges in its brief, "office space lacking exterior light is difficult to rent to executives."

3. The bank contends the assessor erred by failing to hypothesize a sale to a third party in making his appraisal. In applying instead the willing seller-willing buyer test, Mr. Taylor took the view that the most probable use of the building was as a bank. For this reason, he did not consider alternative uses and he hypothesized as a willing buyer a Federal Reserve Bank or similar institution. The bank, however, says this approach is inconsistent with *Space Center, Inc. v. County of Hennepin*, 302 N.W.2d 17 (Minn.1981), in which we affirmed application of the value-in-use concept in evaluating property for tax purposes and stated that "[t]he weight to be given value-in-use depends on there being buyers who would use the property in the same way." *Id.* at 21.

B. Boyce, *Real Estate Appraisal Terminology* 194.

*Space Center* is not in point. There we held it was error for the Tax Court to value a building erected as a commercial warehouse structure not as the warehouse to which it would revert on the market, but by its then current short-term, near-obsolete value-in-use as a modified defense-contract facility. *Space Center's* warehouse is clearly distinguishable from the airport facility in *McCannel v. County of Hennepin*, 301 N.W.2d 910 (Minn.1980). *McCannel* and *Space Center* set up separate theoretical approaches to distinctly different types of factual situations. Whereas the special purpose exception is applied to a building in good condition being used currently and for the foreseeable future for the unique purpose for which it was built, the *Space Center* doctrine, by contrast, is applied, as was its model, *Safran Printing v. City of Detroit*, 88 Mich.App. 376, 276 N.W.2d 602 (1979), to a general purpose building, the design of which is inappropriate or incongruous for its current use. The former approach, more relevant here, is designed to prevent the owner of a distinctive but highly useful building from escaping full property tax liability, while the latter approach is designed to reduce the harshness of applying "intrinsic use" values to an obsolete building.[3]

4. Neither our case law nor cases from other jurisdictions clearly establish the precise limits of the special purpose doctrine, nor, in the nature of things, is this possible. Here, for example, the bank building shares many but not all the features of the more "classic" special purpose properties. While sale of the bank building to a general office tenant is unlikely, it is not impossible. Unlike most special purpose properties, the loss to the bank if the building were sold as office property would not result from the high cost of remodeling but from the loss of investment resulting from the "economic obsolescence" of many of the bank's features to an ordinary buyer. It is helpful, then, to look at the policy reasons involved. The special purpose doctrine arose, it would seem, to enable the city or state to recoup a reasonable amount of property taxes, while the market value approaches of income value or comparable sales artificially lower the assessment. In light of the extreme unlikelihood that this building would ever be sold and considering the large percentage of the building's space which was specially designed for the bank, this policy approach weighs heavily in favor of applying the special purpose doctrine.

5. Interestingly, this same dispute arose when the previous Federal Reserve Building was constructed in Minneapolis earlier in the century. The building, completed in 1924, was valued at $1,770,250 (including the land), while the bank then claimed the true value was only $470,250. The United States District Court, in upholding the state's higher appraised value, explained that the appraiser's reliance on reproduction costs as opposed to income value was appropriate:

> The building when erected was not primarily constructed to return income as such. It is a single purpose building, and many of its features which may detract from its usefulness as an income producing building may materially enhance its value for the purpose for which it was built, and which purpose and use will probably continue for years to come.

*State v. Federal Reserve Bank*, 25 F.Supp. 14, 19 (D.C.Minn.1938).

■ II. If, as we now hold, the assessor properly considered the Federal Reserve Building as a special purpose building, was it error for the assessor to rely exclusively on the reproduction cost approach, to the

---

3. In *Space Center* we cited *Safran Printing Co. v. City of Detroit*, 88 Mich.App. 376, 276 N.W.2d 602 (1979), as an example of a building to be valued under a "value-in-use" approach. After deciding *Safran*, the Michigan Court of Appeals, in *First Federal Savings & Loan Ass'n of Flint v. City of Flint*, 104 Mich.App. 609, 305 N.W.2d 553 (1981), was confronted with the same kind of case we have here, namely, whether a building specially adapted for use as a savings and loan association could be valued as a special purpose building, thus utilizing a replacement cost appraisal method. The Michigan court held yes, pointing out that *Safran* was clearly different.

exclusion of the income and comparable sales approaches? We hold it was not error, in this instance, to use a single-emphasis approach.

Other state courts have generally approved reliance on a single approach in similar situations. Usually, as in our case here, comparable sales are not available for a building that is a special use property. Nor is the income approach always directly relevant. Thus, where "the owner is less interested in the income the property will generate than in occupying a building uniquely suited for the owner's special type of business," the reproduction cost minus depreciation method has been held to be appropriate for determining the market value of a bank, rather than an income approach. *First Federal Savings & Loan Ass'n of Flint v. City of Flint*, 104 Mich.App. 609, 615, 305 N.W.2d 553, 556 (1981). *See also State v. Federal Reserve Bank*, 25 F.Supp. 14, 19 (D.C.Minn.1938); *Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384 (Me.1981); *In Matter of Joseph E. Seagram & Sons, Inc., Appellant v. Tax Commissioner of the City of New York*, 18 A.D.2d 109, 238 N.Y.S.2d 228 (1963). While ordinary office buildings that simply happen to have been expensive to construct should be taxed at their sale value rather than at their actual construction cost, the cases cited by the relator for this proposition are not inconsistent with the special purpose property exception. *Pepsi-Cola Co. v. Tax Commission of the City of New York*, 19 A.D.2d 56, 240 N.Y. S.2d 770 (1963). *See State ex rel. Northwestern Mutual Life Ins. co. v. Weiher*, 177 Wis. 445, 188 N.W. 598 (1922) (where the court refused to apply the special purpose exception to an especially expensive office building in Milwaukee).

Here, even though the bank property was not special purpose in every detail, this was by far its dominant characteristic, and thus we cannot say the Tax Court's acceptance of the assessor's exclusive reliance on the reproduction cost approach was clearly erroneous.

III. The next issue raised by relator is whether the assessment violates its right to equal protection under Minn.Const. art. 10, § 1, and the 14th amendment of the United States Constitution. *See also* Minn. Stat. § 278.01 (1980). We hold the assessment is not constitutionally invalid.

Following the holding in *Hamm v. State*, 225 Minn. 64, 95 N.W.2d 649 (1959), this court recently concluded there must be a substantial disparity in assessment ratios before an equal protection violation is found. *United National Corp. v. County of Hennepin*, 299 N.W.2d 73 (Minn.1980). The Tax Court, in comparing the bank property to other commercial properties in the downtown area, determined that there was no intentional, arbitrary or systematic undervaluation of other property such that the bank was denied equal protection. The evidence amply supports that conclusion.

IV. The last issue is whether those areas of the Federal Reserve Building which are devoted to subtreasury functions are immune from taxation. The Tax Court found no immunity and we agree.

Property owned by federal instrumentalities is immune from real estate taxation unless waived. In 1913 Congress enacted the following provision as part of the Federal Reserve Act: "Federal reserve banks, including the capital stock and surplus therein and the income derived therefrom shall be exempt from Federal, State, and local taxation, *except taxes upon real estate*." 12 U.S.C. § 531 (1976) (emphasis added).

Although the "subtreasury" currency functions were not assigned to the Federal Reserve until 1920, there is nothing in the 1913 law limiting the waiver of immunity to then-current functions, locations or operations of the Federal Reserve. The waiver language is unqualified and clear and even with the assignment of the subtreasury functions to the Federal Reserve, Congress has left the waiver language unchanged for all these years. We see no immunity.

Affirmed.