575 A.2d 649

**F & M SCHAEFFER BREWING COMPANY, c/o Stroh Brewing Company, Appellant,**

v.

**LEHIGH COUNTY BOARD OF APPEALS and County of Lehigh, Appellee (Four Cases).**

Commonwealth Court of Pennsylvania.

Argued March 6, 1990.

Decided May 17, 1990.

198

Seth I. Davenport, with him, John E. Garippa, Garippa & Trevenen, P.C., for appellant.

Thomas M. Caffrey, Asst. County Sol., with him, Lawrence J. Brenner, Allentown, and Alfred K. Hettinger, County Sol., for appellee.

Anthony R. Thompson, Thompson, Somach & Van Gilder, Allentown, for amici curiaw, Pennsylvania Chamber of Business and Industry, and Institute of Property Taxation.

Before CRAIG and PALLADINO, JJ., and BARRY, Senior Judge.

## OPINION

BARRY, Senior Judge.

F & M Schaeffer Brewing Co./Stroh Brewing Co. (taxpayer-appellant), appeals an order of President Judge Backenstoe of the Court of Common Pleas of Lehigh County which denied the taxpayer's appeal, determined the fair market value of the taxpayer's brewery property for the years of 1984–1988 as $34 million, and established the property's assessed value as follows: $8,432,000 for 1984; $8,058,000 for 1985; $7,548,000 for 1986; $6,936,000 for 1987; and $6,120,000 for 1988.

We must decide whether the trial court erred by (1) applying a replacement cost approach to determine the

value of the taxpayer's property; and (2) accepting the appraisal testimony provided by Lehigh County, which the taxpayer contends was based on inadmissible hearsay.

Judge Backenstoe's opinion of March 1, 1989 at P. 2, ably described the property in question:

The subject property involved is a 791,382 square foot facility situated on 62.243 acres of land located on the south side of U.S. Route 22 and on the west side of Pennsylvania Route 100 in Upper Macungie Township. In 1971 a brewery was built on the land by the F & M Schaeffer Brewing Co. and subsequently in 1981, the property was acquired by the Stroh Brewing Co. The bulk of the building area is contained in one large, irregularly shaped manufacturing office and warehouse plant. In addition there are numerous small special purpose buildings located on the southwest side of the main plant.

The plant was built by F & M Schaeffer specifically to produce beer. At the northwest end of the main plant are the tall six story brew houses. In 1982 a new brew house was added to accommodate the special fire brewing process for the production of Stroh's beer. Adjacent to the brew houses are the large silos which contain the grains used in the production of beer. Behind the silos is an interior rail shed which allows grains to be pumped from railroad cars into the silo storage area. Once the beer is brewed it is pumped into fermenter cellars adjacent to the rail shed and eventually it is stored in large storage cellars.

In the middle of the building is a 2 story office section. The office building contains the Stroh House which is a room for entertaining visitors. From the office section there is a visitor's walkway for tours of the plant.

The rear portion of the plant is used for packaging and warehousing. Within this area there are elaborate packaging systems for bottling and canning the various beer products. Within the large warehouse there are three sections for keg washing, full keg storage and empty keg storage. In 1976 an addition was made to the warehouse

to increase storage capacity. Outside the main building are various small support buildings which include additional warehouses, a garage, a waste recovery building, a waste pre-treatment facility, a water recirculation building and a security building. The subject facility, with its attendant equipment, is capable of producing 3,500,000 barrels of beer annually.

After the county [1] assessed the property at a fair market value of $34 million for the years of 1984–1988, the taxpayer sought *de novo* review by the trial court. The parties stipulated as to the common level ratios for the years in question.[2] The taxpayer challenged the county's valuation of the property. Experts for the parties used both the market approach and the cost approach to determine the property's fair market value. After receiving all the evidence, the trial court accepted the county expert's fair market value determination of $34 million, which was based on a replacement cost approach, rather than a reproduction cost approach favored by the taxpayer's experts. This appeal followed.[3]

The taxpayer first contends that the trial court erred in applying a replacement cost approach to determine the property's value.

For tax assessment purposes in third class counties, Section 7(d) of the Third Class County Assessment Act (Act), Act of June 26, 1931, P.L. 1379, *as amended*, 72 P.S. § 5348(d), states that:

> In arriving at the actual value, all three methods, namely, cost (reproduction or replacement, as application, less depreciation and all forms of obsolescence), comparable

1. As did the trial judge, we use the term "county" to include the two respondent-appellees, the Board of Appeals and the County of Lehigh.

2. The stipulated common level ratios were as follows: 24.8% for 1984; 23.7% for 1985; 22.2% for 1986; 20.4% for 1987; and 18% for 1988.

3. Our scope of review in a tax assessment appeal is limited to determining whether the trial court abused its discretion, committed an error of law or whether its decision is supported by the evidence. *Appeal of Duquesne Club*, 92 Pa. Commonwealth Ct. 15, 498 A.2d 459 (1985).

sales and income approaches, must be considered in conjunction with one another.

Thus, Section 7(d) of the Act expressly approves of a cost approach as a method of determining a property's value. *See Reichard–Coulston, Inc. v. Revenue Appeals Board of Northampton County,* 102 Pa. Commonwealth Ct. 227, 517 A.2d 1372 (1986), *appeal denied,* 517 Pa. 611, 536 A.2d 1335 (1987).

■ After considering all of the approaches defined in Section 7(d) of the Act, the trial court accepted the county's application of a replacement cost approach. The court concluded that, because of the property's unique functional and structural characteristics, the property must be classified as a "special purpose property," [4] and thus that a replacement cost approach provided the best method to estimate the property's fair market value. The amici curiae, Pennsylvania Chamber of Business and Industry and Institute of Property Taxation advance strong arguments against treating the property as a special purpose one. The amici submit that the "special purpose property" doctrine should have limited application and recommend the adoption of the rule, apparently judge-made, in the New York case of *Great Atlantic & Pacific Tea Co., Inc. v. Kiernan,* 42 N.Y.2d 236, 397 N.Y.S.2d 718 366 N.E.2d 808 (1977). A remand under this rule is recommended to supply a clear factual record and to permit a finding that the present property cannot be converted to other uses without the expenditure of unreasonably substantial sums of money. Since the legislature in approving the use of the cost approach method did not adopt such a restriction, we refuse

**4.** Special purpose property has been defined as:
property that is treated in the market as adapted to or designed and built for a special purpose. This definition combines both functional and structural aspects: a special purpose property becomes such either by its use for unique functions or by its distinctive, specially-designed structural details. The tax treatment of special purpose property is atypical and follows directly from this definition.
*Federal Reserve Bank of Minneapolis v. State,* 313 N.W.2d 619, 621–22 (Minn.1981).

to conclude that the trial judge abused his discretion in not doing so.

In *Reichard–Coulston*, this Court stated the cost approaches for property valuation as follows: (1) estimating the value of the land, assuming that the land is vacant and available for its highest and best use; (2) estimating the reproduction cost or cost new of the facility; (3) subtracting from the latter amount the facility's depreciation; and (4) adding to this depreciated balance the estimated value of the land.

The taxpayer contends that the "highest and best use" [5] standard, as outlined in *Reichard–Coulston*, is actually a "value-in-use method.[6] Also, the taxpayer contends that the property's highest and best use is for a general manufacturing and warehouse facility.

We note that, before the legislature approved the cost approach, only a property's value-in-exchange was relevant in tax assessment cases. *Pittsburgh–Des Moines Steel.* However, a cost approach now has probative value in fixing property value for tax assessment purposes. *Reichard–Coulston.* Under a cost approach, when the highest and best use of the property is continuing the property's existing use, the property's value to the current user logically is relevant to determine the reproduction or the replacement cost of the facility. The appellant in its reply brief inveighs against the use of the replacement cost approach of appraisal, citing the historical disdain of our courts for the cost approach and approving the statement in the dissenting

**5.** The trial court defined "highest and best use" as:
1. The reasonable and probable use that supports the highest present value of vacant land or improved land, as defined, as of the date of appraisal;
2. The reasonably probable use that supports the highest present value of vacant land or improved land, as defined, as of the date of appraisal; or
3. The most profitable use.

**6.** "The value-in-use method is based upon the value to the current user, which may, of course, be higher that the value in the marketplace." *Pittsburgh–Des Moines Steel Co. v. McLaughlin,* 77 Pa. Commonwealth Ct. 565, 569–70, n. 5, 466 A.2d 1092, 1095 n. 5 (1983).

opinion of *Reichard–Coulston* that the legislature cannot accord probative value to something which has been historically found to have no such quality. *Reichard–Coulston* answers that question:

> We agree with the appellee that the above statute "evidences a legislative intent to have a revenue appeals board and trial court, as fact finder, consider all three approaches to valuing property." The further, ineluctable conclusion to be drawn from this action by the legislature is that the cost approach is *now* to be considered as *possessing* probative value in arriving at property assessments. Consequently, as we view the legislature to be clearly within its powers in so acting, prior judicial pronouncements forbidding use of the cost approach now have no authority. (Emphasis in original.)

102 Pa. Commonwealth Ct. at 232, 517 A.2d at 1375.

In this case, the trial court concluded that the property's highest and best use would be for continued use as a brewery, stating that:

> (1) [Taxpayer's] brewery is the most modern plant in a wide geographical area;
>
> (2) [Taxpayer's] brewery has an excellent location in a very populous area;
>
> (3) Historical and current conditions in the beer industry lead to the conclusion that there is a demand for the brewery;
>
> (4) In comparison with other breweries, [taxpayer's] brewery is a superior facility and it would be very competitive if marketed against other existing breweries.

Opinion of trial court, 3/1/89, P. *10*.

Although the trial court rejected the value-in-use method, it implicitly applied value-in-use analysis to determine the brewery's replacement cost, as required under *Reichard–Coulston*. Because the trial court correctly determined the property's fair market value by using that cost approach, we conclude that the trial court committed no error, and we reject the taxpayer's contention.

 The taxpayer also contends that the trial court erred in its application of a replacement cost approach because the court (1) failed to define the "replacement" property specifically; and (2) included the equipment and machinery as part of the property's replacement cost.

In its brief, the taxpayer defines reproduction cost and replacement cost as follows:

Reproduction cost is the estimated cost to construct, at current prices, *an exact duplicate or replica of the building being appraised,* using the same materials, construction standards, design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies, and obsolescence of the subject building.

Replacement cost is the estimated cost to construct, at current prices, *a building with utility equivalent to the building being appraised,* using modern materials and current standards, design, and layout. (Emphasis added.)

*See* American Institute of Real Estate Appraisers, The Appraisal of Real Estate 351–52 (9th Ed.1987). Thus, by definition, a replacement cost approach does not require the "replacement" facility to be a duplicate or replica of an existing facility; rather, it requires a "replacement" facility with utility equivalent to the existing facility.

To determine the existing facility's utility, the county used general brewing industry standards, namely, a brewery's annual per-barrel production rating, to calculate the cost to replace the existing facility, including the facility's buildings, building improvements, machinery and equipment.

First, the county began with an industry standard of $50 per barrel of annual plant capacity. After further analysis, the county lowered the figure to $48 per barrel of annual plant capacity. The county next used a one-third ratio to estimate the real estate cost of a replacement brewery, with a two-thirds ratio representing machinery and equipment cost of a replacement brewery.

Second, the county applied this one-third ratio to the $48 per barrel capacity to arrive at a $16 per barrel capacity to replace the brewery's real estate. The county next estimated the existing facility's capacity at 3.5 million barrels per year, multiplied 3.5 million by the $16 per barrel capacity and arrived at a gross replacement figure of $56,000,000. Finally, the court applied the formula set forth in *Reichard–Coulston* and determined the net replacement cost for the real estate to be $34,000,000.

In calculating the property's replacement cost, the county did not include the value of the existing facility's machinery and equipment. The appellant and amici contend that the exempt machinery and equipment in appellant's plant are necessarily a part of the assessment appealed. We point out, however, that machinery and equipment, although exempt, are governed by the common law doctrine relating to fixtures and the assembled industrial plant doctrine, which categorizes machinery and equipment as real estate. It is normal for an assessor to be required to extract from an assessment such machinery and equipment. *Jones and Laughlin Tax Assessment Case*, 405 Pa. 421, 175 A.2d 856 (1961) (quinching towers for coke ovens held to be exempt machinery and equipment); *U.S. Steel Corp. v. Board of Assessment and Revisions of Taxes*, 422 Pa. 463, 223 A.2d 92 (1966), (holding exempt (1) the railroad track used exclusively in manufacturing, (2) the craneways for overhead cranes, (3) the ore yard, (4) the blast furnace stock bins, (5) the slag pits, (6) the sintering plant, (7) the ore screening station, (8) the coke screening station, (9) the open hearth charging platforms, (10) the soaking pit platforms and (11) the blast furnace cast houses); *Gulf Oil Corp. v. Delaware County Board of Assessment Appeals*, 88 Pa. Commonwealth Ct. 341, 489 A.2d 321 (1985) (oil tanks used in refining process held to be exempt).

Because the trial court accepted the county's assessment based on the real estate of a "replacement" facility of equivalent utility, or, in other words, a "replacement" brewery, we conclude that the trial court committed no error.

■ The taxpayer finally contends that the county's appraisal testimony was based on inadmissible hearsay.

In *Pittsburgh Outdoor Advertising Corp. Appeal,* 440 Pa. 321, 327, 272 A.2d 163, 166 (1970), the court stated that, under the Eminent Domain Code:[7]

> The use by a testifying valuation expert of facts and figures derived from others and of which he himself does not have personal knowledge occurs frequently and is not a new development. To require direct personal knowledge by the expert of every element going to make up an appraisal figure would be to require the impossible. That there may thus be some hearsay evidence comprised within opinion evidence is undeniable. The components of an expert's opinion, however, go to weight, not admissibility.

In *B.P. Oil v. Delaware County Board of Assessment Appeals,* 114 Pa. Commonwealth Ct. 549, 539 A.2d 473 (1988), this Court applied the court's analysis in *Pittsburgh Outdoor Advertising* to expert testimony in tax assessment cases, stating that the court's language in *Pittsburgh Outdoor Advertising* applies to both written reports and the "use of facts and figures derived from others." 114 Pa. Commonwealth Ct. at 554–55, 539 A.2d at 476.

In this case, the trial court, relying on *B.P. Oil,* accepted the county's expert testimony based on facts and figures derived from others because of the limited information available on the cost of constructing a "replacement" brewery. Therefore, we conclude that the trial court committed no error in accepting this testimony.

We reiterate the comment of the Supreme Court in *Park Drive Manor, Inc. Tax Assessment Case,* 380 Pa. 134, 136, 110 A.2d 392, 394 (1955), quoted by this Court with approval in *In Re: 701 Liberty Avenue Realty Co. v. Board of Property Assessment, Appeals and Review,* 70 Pa. Commonwealth Ct. 377, 380 n. 5, 453 A.2d 59, 60–61 n. 5 (1982):

7. Act of June 22, 1964, Sp.Sess., P.L. 84, *as amended,* 26 P.S. § 1–101 et seq. (Supp.1989–90).

The court of common pleas is the fact-finding body in a tax assessment appeal. The principle is clear that the findings of the court of common pleas have great force and will not be set aside by this court unless clear error is made to appeal.... Nor will the appellate court disturb the findings and substitute its judgment for that of the court of common pleas, because it is clear that market value is a factual question to be determined by the trial court on the basis of expert testimony.

*Park Drive Manor*, 380 Pa. at 136–137, 110 A.2d at 394.

Accordingly, we affirm President Judge Backenstoe's decision.

### ORDER

NOW, May 17, 1990, the consolidated order of the Court of Common Pleas of Lehigh County, at Nos. 83–C–3255, 83–C–3418, 84–C–1899 and 86–C–812, dated March 1, 1989, is affirmed.

CRAIG, Judge, dissenting.

Although use of the replacement cost approach is valid in determining an assessment for this special-purpose brewery plant, unreliability and uncertainty in the assessment process will be the likely result of approving the vague and overly general elements which the county appraisers here used in implementing the replacement cost approach.

Precisely because this brewery does have "unique functional and structural characteristics," as the trial court stated, the county appraisers should have looked closely at the real estate elements of *this* plant and, in order to deduct nonassessable elements, should have scrutinized carefully the machinery and equipment in *this* plant. Instead, the record is clear that the county appraisers looked elsewhere.

Of most concern is the fact that they relied upon plant cost figures derived chiefly from annual per-barrel production ratings. The county began with a "brewing industry" standard estimating total plant cost to be $50 per barrel of

annual plant capacity; the county then lowered that figure to $48 per barrel of annual plant capacity. However, because that construction cost unit includes the cost of machinery and equipment, the county then proceeded upon the assumption that two-thirds of the $48 is attributable to machinery and equipment, in order to arrive at a $16 per-barrel capacity for real estate structures. Multiplying that amount by the estimated annual capacity of the facility in question, the county arrived at a gross replacement figure of $56,000,000.

Even though the county thereafter followed the replacement cost approach of *Reichard–Coulston, Inc. v. Revenue Appeals Board of Northampton County,* 102 Pa. Commonwealth Ct. 226, 517 A.2d 1372 (1986), *appeal denied,* 517 Pa. 611, 536 A.2d 1335 (1987), by subtracting a figure for depreciation and adding the estimated value of the land, the final result necessarily can be no less unreliable than the starting figure of $48 or $50 per barrel of annual plant capacity.

For that crucial starting figure, the county appraisers went to the brewing industry, unfortunately, rather than to real estate appraisal sources. In an attempt to support such an approach, the county appraisers considered breweries in Michigan and Ohio not shown to be comparable to the Pennsylvania facility in question. Construction cost estimates came, second-hand, from a brewmaster and a plant engineer.

The county also made reference to the Marshall Valuation Service Manual for the $50 per barrel figure, but the record shows that source acknowledges itself as providing only "very rough guides...." On the basis of "discussions with other persons associated with the brewing industry," the county appraiser witness considered construction costs to be "in a range from approximately $45 to $60 per barrel of annual production capacity."

Precisely because this property has "unique functional and structural characteristics," (as this court's opinion points out) reliance upon such general relationships between

productive capacity and construction costs, at plants elsewhere, cannot be a sufficient approach.

Even if we assume that those wide-ranging amounts could provide a valid representation of total plant cost, the county appraisers never did analyze the value of the specific machinery and equipment at the property in question, in order to arrive at an accurate amount to deduct from the total.

Merely attributing two-thirds of total plant cost per production unit to machinery and equipment, in order to deduct them, is obviously an extremely inaccurate way to proceed. The productive capacity of a plant necessarily will vary greatly, depending upon the relative efficiency of the specific machinery and equipment employed. Because well-designed modern machinery necessarily will achieve greater productivity than machinery of a poor design, the flat attribution of two-thirds of plant cost to machinery in all cases is necessarily an unspecific rule of thumb.

Although this court certainly has no power to override the findings of a trial judge on a credibility basis, the county's valuation evidence here lacks just not credibility, but competence. Even if every word of the county witnesses is believed, their method is not competent, because it has, at best, only loose relevance to the property sought to be appraised.

This court should vacate the decision appealed from and should remand the case to the trial court for redetermination of a tax value based upon the record, but excluding the county's appraisal evidence resting upon its overgeneralized relationships between productive capacity and plant costs.