[Cite as *Kettering City Schools Bd. of Edn. v. McDonald's USA, L.L.C.; Montgomery Cty. Bd. of Revision*, 2018-Ohio-2323.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| KETTERING CITY SCHOOLS BOARD OF EDUCATION, *Appellee* | : | |
| | : | |
| | : | Appellate Case No. 27684 |
| v. | : | |
| | : | BTA Case No. 2015-2328 |
| MCDONALD'S USA, LLC, *Appellant;* | : | |
| MONTGOMERY COUNTY BOARD OF REVISION, *Appellee* | : | (Administrative Appeal from Board of Tax Appeals) |
| | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 15th day of June, 2018.

. . . . . . . . . .

MARK H. GILLIS, Atty. Reg. No. 0066908 and KAROL C. FOX, Atty. Reg. No. 0041916
6400 Riverside Drive, Suite D, Dublin, Ohio 43017
    Attorneys for Appellee

CHARLES L. BLUESTONE, Atty. Reg. No. 0060897 and PATRICK J. HEERY, Atty. Reg.
No. 0092060, 141 East Town Street, Suite 100, Columbus, Ohio 43215
    Attorneys for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** In this case, Appellant, McDonald's USA, LLC ("McDonald's"), appeals from a decision of the Board of Tax Appeals ("BTA") finding the taxable value of McDonald's property to be $2,000,000. This was the amount proposed by Appellee, Kettering City Schools Board of Education ("BOE").

**{¶ 2}** As support for its appeal, McDonald's contends that the BTA acted unreasonably and unlawfully, and abused its discretion, by failing to find that McDonald's appraisal evidence constituted competent and probative evidence of the subject property's market value, and by failing to find that McDonald's met its burden of proof. McDonald's further contends that the BTA abused its discretion by finding the BOE's appraisal analysis more competent and probative, by considering the subject property's present use when deciding the property's market value, and by accepting the capitalization rate of the BOE's expert rather than the rate used by McDonald's expert. Finally, McDonald's contends that the BTA abused its discretion by recognizing the BOE's appraiser as an expert witness.

**{¶ 3}** We conclude that the BTA did not abuse its discretion, and that the BTA's factual findings are supported by reliable and probative evidence. The record also supports the BTA's decisions on credibility and the weight to be attached to the evidence. Accordingly, the judgment of the BTA will be affirmed.

I. Facts and Course of Proceedings

**{¶ 4}** This appeal involves the valuation of real property (Parcel No. N64-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), located at 1872 East Stroop Road in Kettering, Ohio. The property consists of

1.163 acres of land, and a 4,686 square foot improvement (a McDonald's restaurant) that was built in 2006. As of January 1, 2014, the Montgomery County Auditor had appraised the property's value at $1,082,720.

{¶ 5} After McDonald's filed a request with the Montgomery County Board of Revision ("BOR"), seeking a reduction in value, the BOE filed a counter-complaint. The BOR then held a hearing on October 26, 2015. McDonald's expert, Stephen Weis, testified at the BOR hearing and valued the property at $760,000. The BOR issued a decision on November 7, 2015, finding a value of $764,000, and the BOE filed a timely notice of appeal with the BTA.

{¶ 6} Unfortunately, the BOR failed to provide the BTA with a complete record due to a malfunction of equipment on the day of the BOR hearing. As a result, when the BTA hearing was held on October 6, 2016, the hearing began with testimony from Weis. Weis testified and also submitted his appraisal report, which was dated October 23, 2015.

{¶ 7} Weis used two methods of valuation: a sales approach and an income capitalization approach. He did not use a third method, the cost approach, because of the age and specific design of the building, which would make an estimate of depreciation difficult. According to Weis, the best and highest use of the property as it existed was as a restaurant. *See* Logix Appraisal, p. 25. Although the building had some elements of the McDonald's design, Weis concluded that if those items were removed, the building would come back as a regular, typical-use, free-standing building. He, therefore, rejected any type of special design or special purpose, which he described as being something like a power plant, church, school, or stadium.

{¶ 8} For purposes of the sales approach, Weis selected six properties that had

sold from 2013 to 2015. These included: (1) a former 5,033 square foot Applebee's on West Dorothy Lane in Kettering, Ohio, which was built in 2002, was a full-service restaurant, and was vacant at the time of sale; (2) a 3,120 square foot Arby's on Brandt Pike in Huber Heights, Ohio, which was built in 1988 and was occupied at the time of sale; (3) a 3,080 square foot former KFC and A&W Root Beer on Old Troy Pike in Huber Heights, Ohio, which was built in 2002 and was vacant at the time of sale; (4) a 1,815 square foot Subway on Woodman Drive in Kettering, Ohio, which was located in a building built in 1972 and renovated for Subway in 2000; (5) a 5,496 square foot Longhorn Steakhouse on West Dorothy Lane in Kettering, Ohio, which was built in 2003, was a full-service, sit-down restaurant, and was vacant at the time of sale; and (6) a 3,975 square foot Burger King located on Wilmington Pike that was built in 2000, was vacant at the time of sale, and was demolished and replaced by a Tire Discounter store.

{¶ 9} The sale prices for these properties ranged from a high of $185.86 per square foot (for Longhorn) to a low of $67.28 per square foot (for Burger King). After making adjustments for factors like location, square footage, and age compared to the subject property, the prices for the comparable properties ranged from a minimum adjusted value of $77.09 to $165.88 per square foot. Properties other than the Burger King were in a tight range, between $145 and $166 per square foot, so Weis adjusted to a value of $160 per square foot for the subject property, which resulted in a value of $750,000.

{¶ 10} With respect to the income capitalization approach, the McDonald's restaurant on Stroop Road was owner-occupied, and there was no contract rental rate on the property. In order to arrive at a lease rate, Weis again used properties in Montgomery County, Ohio, and included triple net lease rates for the following nine

properties, eight of which were restaurants: (1) a 1,804 square foot Marina Fish and Chicken restaurant on Dixie Drive in West Carrollton, Ohio, which was in a building that was built in 1983; (2) a 1,800 square foot CJ Chan restaurant on Alex Bell Road in Moraine, Ohio, which was in a building that was built in 1999; (3) a 1,200 square foot China Bistro on Brown Street in Dayton, Ohio, which was in a building that was built in 2007; (4) a 1,815 square foot Subway on Woodman Drive in Kettering, Ohio, which was in a building that was built in 1972; (5) a 7,447 square foot Fricker's restaurant on Miller Lane in Dayton, Ohio, which was in a building that was built in 1987; (6) a 1,400 square foot Pizza Hut on Harshman Road in Dayton, Ohio, which was in a building that was built in 2000; (7) a 6,343 square foot El Rancho Grande restaurant on Wilmington Pike in Kettering, Ohio, which was in a building that was built in 1994; (8) a 3,410 square foot Arby's on National Road in Dayton, Ohio, which was in a building that was built in 2000; and (9) a 2,792 square foot Clark's retail store, which was located in a former Wendy's restaurant on Far Hills Avenue in Centerville, Ohio, in a building that was built in 1985. The initial lease dates for these properties ranged between June 2009 and September 15, 2015, and the rates per square foot, were, respectively, as follows: (1) 12.50; (2) $13.25; (3) $15.00; (4) $12.89; (5) $13.01; (6) $15.00; (7) $8.00; (8) $15.00; and (9) $18.50.    After adjustments made in comparison with the subject property, the rates on these properties ranged from a low of $11.24 to a high of $16.43.

{¶ 11} Weis then reconciled the rates and used an upper rate for the McDonald's property of $15.50 per square foot on a triple net basis.  This amount, added to reimbursement revenue of $7.30 per square foot and multiplied by the property's square footage, resulted in potential gross annual income of $106,844.  Because the vacancy

rate in a two-mile radius of retail properties was 10%, Weis applied a fictional 5% vacancy rate and arrived at $101,502 of potential annual gross income. He then used market expenses to create a pro forma, in which part of the expenses were reimbursed and part were not, to determine a net operating income ("NOI") of $63,270.

{¶ 12} At that point, Weis applied a direct capitalization ("cap") rate of 8.25% to convert the NOI into a valuation. To arrive at the direct cap rate, Weis reviewed cap rates for 32 retail properties in several Ohio counties; less than one-third were restaurants. The average cap rate for these properties was 8.97%, which was reconciled slightly below at 8.25%, to reflect the risk inherent with the subject property. Weis stated that the subject property was "less risky," but did not explain his reasoning for this statement, nor did he say why he chose the specific amount of reduction.

{¶ 13} Ultimately, Weis prepared another pro forma by removing the real estate taxes and reimbursement, which changed the NOI. To account for that, he applied a tax additur of .17%, which resulted in an adjusted cap rate of 8.42%. Based on the adjusted NOI without taxes ($64,558) and the 8.42% rate, Weis arrived at a value for the property of $766,541, which he rounded up to $770,000. Weis gave the most weight to the sales comparison approach, and after reconciling the two values, arrived at a final value for the property of $760,000.

{¶ 14} At the hearing, the BOE presented the report and testimony of its expert, Thomas Sprout, who viewed the property in late April 2016 and valued it at $2,000,000. He testified that the location was very good. It was located on an outlot of a Meijer store and was at a corner-signalized interchange of two primary arterials in Kettering, Ohio. Traffic counts were "about 30,000," which was a heavy volume and would indicate a very

good and typical location for a national fast-food restaurant.

{¶ 15} Sprout concluded that the property fit within the definition of a special purpose property in the Dictionary of Real Estate Appraisal, but he did not appraise it as such. Like Weis, Sprout used the sales comparison and income approaches to value the property.

{¶ 16} Unlike Weis, Sprout revealed that the original McDonald's restaurant on the site had been built in 1979 and was operated there until 2006, when the current building was constructed.[1] McDonald's, thus, had decided that this was an economically viable site. The building was surrounded by a Meijer store, a Wendy's, a Dunkin' Donuts, and strip retail with a residential backdrop. The property was zoned for business, and Kettering, for the most part, was built-out.

{¶ 17} As part of Sprout's highest and best use analysis, he conducted a vacancy survey of all retail within a two-mile radius and found a 10% vacancy rate. Based on the zoning, surrounding land uses, and the existing use as a national fast food restaurant, Sprout concluded that the most profitable use for the property was as a national fast-food restaurant, as improved. Vacant, the most profitable use would be for a national single-tenant user. Sprout, therefore, compared data for sales of fast-food restaurants and rental properties that would fit that type of tenant.

{¶ 18} Sprout gave primary weight to the income approach because rents were

---

[1] The significance of this is that Weis relied on the sale and planned demolition of a nearby Burger King that had been constructed in 2000. Based on this fact, Weis opined that the economic life of restaurant properties had a 15-year life and no more economic life. Because the McDonald's had been constructed in 2006 and was being valued in 2014, Weis indicated that he would depreciate the economic life of the McDonald's by 50% and that would be taken into consideration. This was despite the fact that the prior McDonald's building had been used for around 27 years.

readily available for this type of property. However, he did perform both analyses.

{¶ 19} For sales comparisons, Sprout selected the following seven properties: (1) a 2,841 square foot Skyline Chili on Miller Lane in Dayton, Ohio, which was built in 1998, was occupied at the time of sale, and had five years remaining on the lease; (2) a 2,204 square foot Chipotle on Senate Drive in Monroe, Ohio, which was built in 2011, was occupied at the time of sale, and had more than 14 years left on the lease when sold; (3) a 2,240 square foot Chipotle on North Main Street in Englewood, Ohio, which was built in 2012, was occupied at the time of sale, and had 14 years and 9 months left on a lease at the time of sale; (4) a 2,240 square foot Chipotle on Possum Run Road in Washington Township, Richland County, Ohio, which was built in 2013, was occupied at the time of sale, and was in the first year of the lease when purchased; (5) a 3,456 square foot property in Orange Township, Delaware, Ohio, which was built in 1998, was vacant at the time of sale, and had housed two restaurants that had failed; (6) a 3,366 square foot Arby's on East Leffels Lane in Springfield, Ohio, which was built in 1997 and improved in 2015, was occupied at the time of sale, and had a 15-year lease that was signed prior to the sale; and (7) a 4,702 square foot former Ruby Tuesday's on Hilliard Rome Road in Columbus, Ohio, which was built in 2005, was occupied at the time of sale, and had two tenants with 10-year leases that began in 2014. All these properties sold between June 2012 and December 2015. Four sales were located within the Dayton-Cincinnati market, and three were in north central Ohio.

{¶ 20} The price per square foot for the properties, respectively, was: (1) $436.47; (2) $759.98; (3) $633.48; (4) $765.63; (5) $180.84 (for the vacant property); (6) $399.29; and (7) $448.75. Sprout included the former vacant restaurant to illustrate the sale of

what the subject property was not – a vacant site with an inferior location. The former Ruby Tuesday's was included because it had been converted from a single-tenant property and was in a good location.

{¶ 21} After making adjustments for market conditions, land ratio, building size, location, condition/quality, whether the location had a drive-thru, and the lease rates, Sprout concluded that a value for the subject property as of the tax lien date was between $425 and $450 per square foot, resulting in a value between $1,990,000 and $2,110,000. Sprout indicated that when he looked for comparable locations, he based his selection on fly-by-traffic, demographics, and similar sales in the market area. If data in close proximity does not match a property's use, then he expands the search to find comparable properties. Sprout stressed that the subject property was used for a national food chain, not a "mom and pop" operation.

{¶ 22} Sprout felt the income approach was the primary indication, and selected these locations: (1) a 2,240 square foot Chipotle on North Main Street in Englewood, Ohio, which was in a building built in 2012, with a lease that was executed in 2012; (2) a 3,366 square foot Arby's on East Leffels Lane in Springfield, Ohio, which was in a building built in 1997 and improved in 2015, with a 30-year lease signed prior to the December 2015 sale; (3) a 2,747 square foot Wendy's on State Route 235 in Huber Heights, Ohio, which was in a building built in 1997, with a lease that began in 2006 and would expire in January 2026; (4) a 2,204 square foot Chipotle on Senate Drive in Monroe, Ohio, which was in a building built in 2011, with a lease that was entered into in 2012; (5) a 2,240 square foot Chipotle on Possum Run Road in Washington Township, Richland County, Ohio, which was in a building built in 2013, with a lease that was entered into in 2014; (6)

a 3,654 square foot Steak n' Shake on East Main Street in Columbus, Ohio, which was in a building built in 1999, with a lease that was due to expire in 2018; (7) a 1,804 square foot building on East Dixie Drive in West Carrollton, Ohio, which was built in 1983, had formerly housed a Taco Bell, and was available for lease; and (8) a 3,680 square foot building on East Dorothy Lane in Kettering, Ohio, that was built in 1999, had formerly housed a Krispy Kreme, and was available for lease. All the properties except the last two had triple net leases.

{¶ 23} The lease rates for these properties per square foot, were, respectively, as follows: (1) $38 (years 1-5), $41.80 (years 6-10), and $45.98 (years 11-15); (2) $24.96 (Jan. 2016-Dec.2020, and then 6.5% increases in years 6 and 11); (3) ($36.60 as of Jan. 1, 2014, and rent increases of 1.75% annually); (4) $46.14 (years 1-5), $50.76 (years 6-10), and $55.83 (years 11-15); (5) $41.75 (years 1-5), $45.93 (years 6-10), and $50.52 (years 11-15); (6) $30.10 (expiring in 2018); (7) $12.30 (lease offering, modified gross); and (8) $25 (lease offering, modified gross).

{¶ 24} After adjusting for condition, size, and location, Sprout concluded that a market rent for the subject property would be $38 per square foot, assuming taxes at Sprout's appraised value. He noted that this was consistent with rent comparables 1 and 3 (the Chipotle in Englewood, Ohio, and the Wendy's in Huber Heights, Ohio). He considered comparables 4 and 5 superior to the subject property, considering their smaller size and superior condition; comparables 2, 6, 7, and 8 were considered inferior, due to their inferior condition and/or location. This market rent would generate base rent of $178,068, and a total building expense of $356,750, which included rent plus property expenses.

{¶ 25} Like Weis, Sprout prepared a stabilized profit and loss statement. Using the market rate rent, he calculated the net effective gross income using the current taxes and with the taxes that would apply with his value calculation. With the taxes included as reimbursable income, and applying a 10% vacancy rate, the net effective gross income for the property with the proposed tax value was $320,913. After subtracting expenses like property taxes, insurance, site maintenance fees, and so on, Sprout arrived at NOI of $141,239. He applied a cap rate of 7.00%, and his conclusion as to valuation using the income based approach was $2,020,000. He then applied a tax additur adjustment method to account for his appraisal's anticipated increase in property taxes. This involved adding the current taxes to the net operating income and then dividing by a capitalization rate increased by a 3.44% effective tax equalization rate. The final income based valuation he reached was 2,000,000.

{¶ 26} The cap rate was derived from the sales of fast-food restaurants in southwest Ohio and north central Ohio that provide cap rates, with only one of those being in north central Ohio. These rates ranged from 5.45% to 6.77%, with the rate for the Englewood, Ohio, Chipotle being 6.00%. Sprout also referenced a national publication listing typical cap rates in the net lease market within the United States. In the first quarter of 2014, the rates ranged between 6.00% and 8.50%, with an average of 7.03%. Sprout concluded that a cap rate near the middle of the range would be appropriate for the subject property, and used a 7.00% rate. He further indicated that he did not take into consideration the fact that McDonald's would be the tenant, even though McDonald's would be the "gold standard" from the standpoint of an investment company.

{¶ 27} Sprout did not calculate a vacancy-weighted tax additur in his report. He

indicated at the hearing that he does not do valuations that way because, in his experience, taxes are part of the rent. However, he calculated the vacancy-weighted tax additur at the hearing, which resulted in a valuation of $2,017,000. Transcript of October 6, 2016 BTA Hearing ("BTA Hearing"), pp. 144-147. Finally, after comparing the values derived from the sales comparison approach and the income approach, Sprout arrived at a final valuation of $2,000,000.

{¶ 28} The BTA issued a decision and order on July 10, 2017, concluding that Sprout's analysis of value on the tax lien date was the most competent and probative evidence of value. Accordingly, the BTA ordered that the subject property's true and taxable value as of January 1, 2014, was $2,000,000.

{¶ 29} McDonald's filed a timely appeal from the decision and order of the BTA, and the BTA subsequently filed a copy of the record with our court. The parties have filed briefs, and this matter is now ready for resolution.

II. Acceptance or Rejection of the Appraisal Evidence

{¶ 30} In the notice of appeal from the BTA's decision, McDonald's raised seven assignments of error. However, in its brief, McDonald's has consolidated some of the assignments of error. In considering the assignments of error, we will follow the format that McDonald's has used in its brief.

{¶ 31} McDonald's has combined its discussion of the First and Second Assignments of Error, which state as follows:

> The Board of Tax Appeals Acted Unreasonably and Unlawfully, and
>
> Abused Its Discretion, When It Failed to Find that Appellant's Appraisal

Evidence Constituted Competent and Probative Evidence of the Market Value of the Subject Property.

The Board of Tax Appeals Acted Unreasonably and Unlawfully, and Abused Its Discretion, When It Failed to Find that Appellant Met Its Burden of Proof, When the Record Contained Reliable and Probative Evidence to Support Appellant's Market Value of the Subject Property.

{¶ 32} Under these assignments of error, McDonald's makes two main claims: (1) Weis used a more appropriate technique for valuing the subject property; and (2) Sprout's appraisal methodology and analysis produced inconsistent results. Before we address these assignments of error, we will briefly note the appropriate standards that apply to BTA decisions.

{¶ 33} When cases are appealed to the BTA from boards of revision, an appellant has the burden of proving its right to a decrease or increase in value from the value that the board of revision has determined. (Citations omitted.) *Shinkle v. Ashtabula Cty. Bd. of Revision*, 135 Ohio St.3d 227, 2013-Ohio-397, 985 N.E.2d 1243, ¶ 24. This means that the "appellant must come forward and demonstrate that the value it advocates is a correct value. Once competent and probative evidence of value is presented by the appellant, the appellee who opposes that valuation has the opportunity to challenge it through cross-examination or by evidence of another value." (Citation omitted.) *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 6.

{¶ 34} The BTA, itself, as a taxing authority, has an independent duty to weigh evidence and make findings, and the BTA reviews the administrative decisions of boards

of revision de novo as to both fact and law. *MacDonald v. Shaker Hts. Bd. of Income Tax Rev.*, 144 Ohio St.3d 105, 2015-Ohio-3290, 41 N.E.3d 376, ¶ 21; *Coventry Towers, Inc. v. City of Strongsville*, 18 Ohio St.3d 120, 122, 480 N.E.2d 412 (1985). Under R.C. 5717.01, the BTA has "three options when hearing an appeal: the board may confine itself to the record and the evidence certified to it by the board of revision, hear additional evidence from the parties, or may make such other investigation of the property as is deemed proper." *Coventry Towers* at 122.

{¶ 35} Under what is called the "*Bedford* rule," " 'when the board of revision has reduced the value of the property based on the owner's evidence, that value has been held to eclipse the auditor's original valuation,' and the board of education as the appellant before the BTA may not rely on the latter as a default valuation." *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 147 Ohio St.3d 38, 2016-Ohio-3025, 59 N.E.3d 1270, ¶ 6, referencing *Bedford Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 115 Ohio St.3d 449, 2007-Ohio-5237, 875 N.E.2d 913. (Other citation omitted.) Thus, when the board of revision adopts a new value based on an owner's evidence, the burden of going forward shifts to the board of education on appeal to the BTA. *Id.* The board of education then has the burden to establish a new value, whether that be the valuation of the auditor or another value. *Id.* at ¶ 7.

{¶ 36} This rule does not apply if the auditor is the appellant before the BTA; in that situation, the auditor "may rely on the more general rule that the initial valuation should constitute a default valuation, the validity of which does not need to be demonstrated if the basis for the reduction is challenged." *Dublin City Schools Bd. of Edn.* at ¶ 10, citing *Colonial Village, Ltd. v. Washington Cty. Bd. of Revision*, 123 Ohio

St.3d 268, 2009-Ohio-4975, 915 N.E.2d 1196, ¶ 30. (Other citation omitted.)

{¶ 37} With respect to our review of BTA decisions, we note that McDonald's notice of appeal was filed before the effective date of recent amendments to R.C. 5717.04, which became effective on September 29, 2017. *See* Am. Sub. H.B. 49, 2017 Ohio Laws File 14. Prior to the amendments, parties had the option of appealing decisions of the BTA to the Supreme Court of Ohio, as well as to the court of appeals for the county in which the taxed property was situated. However, the statute was amended to eliminate initial appeals to the Supreme Court of Ohio, and the court of appeals in which a notice of appeal has been filed now has exclusive jurisdiction.[2] *See* Am. Sub. H.B. 49, 2017 Ohio Laws File 14, Part 15.

{¶ 38} R.C. 5717.04, as amended, states that:

If upon hearing and consideration of such record and evidence the applicable court decides that the decision of the board appealed from is reasonable and lawful it shall affirm the same, but if the court decides that such decision of the board is unreasonable or unlawful, the court shall reverse and vacate the decision or modify it and enter final judgment in

---

[2] An exception was made for appeals in which a party files a petition requesting a transfer of jurisdiction to the Supreme Court of Ohio. The petition must be filed within 30 days after the notice of appeal has been filed with the appropriate court of appeals, and the petition must be filed with the Supreme Court of Ohio. If the appeal "involves a substantial constitutional question or a question of great general or public interest," the Supreme Court of Ohio may approve the petition and order the appeal to be taken directly to the Supreme Court. However, if jurisdiction is not transferred, the appeal proceeds in the court of appeals. *See* R.C. 5717.04, as amended in 2017. The remainder of the amendments to R.C. 5717.04 are non-substantive, except for a line that was added which stated that "[a]s used in this section, 'taxpayer' includes any person required to return any property for taxation."

accordance with such modification.[3]

**{¶ 39}** The general standards for reviewing BTA decisions are well settled. If the BTA's decision is both "reasonable and lawful," the reviewing court must affirm. *NWD 300 Spring, L.L.C. v. Franklin Cty. Bd. of Revision*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, ¶ 13, citing R.C. 5717.04. Nonetheless, a reviewing court does not hesitate to reverse BTA decisions that are based on incorrect legal conclusions. *See, e.g.*, *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, citing *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001). Consequently, questions of law are reviewed de novo. *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, ¶ 13; *Terraza 8, L.L.C. v. Franklin Cty. Bd. of Revision*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, ¶ 7.

**{¶ 40}** Review of BTA decisions "is guided by the premise that ' "[t]he fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities." ' " *NWD 300 Spring* at ¶ 13, quoting *EOP-BP Tower,* 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, at ¶ 17. (Other citation omitted.) The BTA's factual decisions are upheld "if the record contains reliable and probative evidence supporting the BTA's determination." *Dublin City Schools Bd. of Edn.*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, at ¶ 13, citing *Satullo* at ¶ 14. Deference is also given to BTA findings about the weight of the evidence, as long as the findings are supported by the record. *Terraza 8* at ¶ 7, citing *Olmsted Falls*

---

[3] The amendment to this paragraph is non-substantive, as the only change under the 2017 revision was the insertion of the word "applicable." Am. Sub. H.B. 49, 2017 Ohio Laws File 14, Part 15. Thus, the standard of review has not been affected.

*Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 122 Ohio St.3d 134, 2009-Ohio-2461, 909 N.E.2d 597, ¶ 27.

{¶ 41} Article XII, Section 2 of the Ohio Constitution requires property to be "taxed by uniform rule according to value." "This provision generally requires a real-property valuation to ascertain 'the *exchange* value' of the property." (Citation omitted; emphasis sic.) *Johnston Coca-Cola Bottling Co. v. Hamilton Cty. Bd. of Revision*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, ¶ 13. As a general rule, "the value or true value in money of any property is the amount for which that property would sell on the open market by a willing seller to a willing buyer. In essence, the value of property is the amount of money for which it may be exchanged, i.e., the sales price." *State ex rel. Park Inv. Co. v. Bd. of Tax Appeals*, 175 Ohio St. 410, 412, 195 N.E.2d 908 (1964). Actual sales are the best way to determine value, when they are available. (Citations omitted.) *Terraza 8*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, at ¶ 9.

{¶ 42} However, where no recent sales of the property have occurred, the BTA has wide latitude in the matters it can consider, and broad discretion in the weight it can attach to expert testimony. (Citations omitted.) *Wynwood Apts, Inc. v. Bd. of Revision of Cuyahoga Cty.*, 59 Ohio St.2d 34, 35, 391 N.E.2d 346 (1979). When the BTA reviews appraisals, it also " 'is vested with wide discretion in determining the weight to be given to the evidence and the credibility of the witnesses that come before it.' " *NWD 300 Spring*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, at ¶ 13, quoting *EOP-BP Tower,* 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, at ¶ 9. (Other citation omitted). Reviewing courts also apply an abuse of discretion standard to BTA decisions on witness credibility and the weight their testimony is given. *Id.* at ¶ 14. An abuse of

discretion refers to "an unreasonable, arbitrary, or unconscionable attitude." *Renacci v. Testa*, 148 Ohio St.3d 470, 2016-Ohio-3394, 71 N.E.3d 962, ¶ 32, citing *J.M. Smucker, L.L.C. v. Levin*, 113 Ohio St.3d 337, 2007-Ohio-2073, 865 N.E.2d 866, ¶ 16.

**{¶ 43}** With these standards in mind, we will consider McDonald's arguments. As was noted, McDonald's first contention is that its own expert, Weis, used more appropriate methodology in valuing the property than the BOE's expert, Sprout, did. The crux of this argument is that in evaluating a property in Montgomery County, an appraiser should look only at local properties in the county, and that Sprout neglected to consider this factor in choosing comparable properties. McDonald's further contends that the BTA erred by ignoring issues that were raised, like the alleged subjective nature of Sprout's qualitative adjustments, his lack of clear methodology, and problems with Sprout's "sales-breakpoint" analysis.

**{¶ 44}** As was noted, the BTA found that Sprout's analysis of value was the most competent and probative evidence of value. The BTA noted that Sprout had considered the unique physical nature of the property in deciding that the property's physical components indicated that it was most suitable for the property's continued use to be consistent with its original purpose as a fast-food restaurant. The BTA also stressed, however, that Sprout had not appraised the property as if it were a special-purpose property.

**{¶ 45}** In addition, the BTA concluded that Sprout had selected appropriate comparable properties, under both of his valuation approaches, by using other fast-food restaurants for comparison. Notably, the BTA found that Weis relied on dissimilar properties, including sit-down restaurants, vacant properties, and at least one property

that had been converted to a different use, all of which resulted in undervaluation of the subject property.   BTA Decision and Order, p. 4.[4]

**{¶ 46}** After reviewing the entire record, we find no abuse of discretion by the BTA in its choice of which appraiser to credit.   As was noted, the BTA has wide discretion over the weight to be given evidence and the credibility of witnesses when it reviews appraisals.   *NWD 300 Spring*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, at ¶ 13.   We must also uphold the BTA's factual decisions if there is reliable and probative evidence to support the BTA's decision.   *Dublin City Schools Bd. of Edn.*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, at ¶ 13.

**{¶ 47}** As was also noted, Article XII, Section 2 of the Ohio Constitution requires property to be "taxed by uniform rule according to value," which generally requires ascertainment of a property's exchange value, or the amount of money for which the property may be exchanged between willing buyers and sellers.   *Johnston Coca-Cola Bottling*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, at ¶ 13.   While actual sales are the best way to determine value, they are often not available and value is calculated by using other evidence and other methods.   *Terraza 8*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, at ¶ 9; *Wynwood Apts*, 59 Ohio St.2d at 35, 391 N.E.2d 346.   *See also, e.g.*, Ohio Adm.Code 5703-25-07(D) (allowing county auditors to use any or all of three recognized approaches to value: the market data approach, which uses comparable sales, the income approach, or the cost approach).   Both appraisers in the case before us rejected the "cost approach" and elected to use the sales comparison and income or

---

[4] The BTA decision in the case before us is also reported as *Kettering City Schools Bd. of Edn. v Montgomery Cty. Bd. of Revision*, BTA No. 2015-2328, 2017 WL 3034545 (July 10, 2017).

income capitalization approaches.

{¶ 48} The "special-purpose" rule was discussed in *Dinner Bell Meats, Inc. v. Cuyahoga Cty. Bd. of Revision*, 12 Ohio St.3d 270, 466 N.E.2d 909 (1984), where the court noted that "Section 2, Article XII of the Ohio Constitution mandates that valuations of property cannot be limited to considerations of current use only to the exclusion of all other relevant factors." *Id.* at 271.   However, the court stressed that this prohibition "does not prohibit altogether any consideration of the present use of a property."   *Id.*

{¶ 49} In *Dinner Bell*, an appraiser had viewed the property in question (a meat-packing facility) as being " 'special purpose' in nature."   *Id.*   According to the opposing party, this violated the constitutional provision against valuing property using the " 'current use method,' " and the BTA, therefore, should have disregarded the appraisal.   *Id.* at 271.

{¶ 50} The "current use" method of evaluation cannot be the basis of valuing real property for tax purposes because it " 'excludes, among other factors, location and speculative value which comprise market value * * *.' "   *Id.*, quoting *State ex rel. Park Inv. Co. v. Bd. of Tax Appeals*, 32 Ohio St.2d 28, 33, 289 N.E.2d 579 (1972); *Rite Aid of Ohio, Inc. v. Washington Cty. Bd. of Revision*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177, ¶ 27.

{¶ 51} In responding to the argument that the appraiser had incorrectly evaluated the meat-packing property by employing the current use method, the Supreme Court of Ohio noted in *Dinner Bell* that there is a "special purpose exception" to the prohibition against valuation based only on current use.   The court remarked that this exception " 'is applied to a building in good condition being used currently and for the foreseeable future

for the unique purpose for which it was built * * *. * * * [T]o hold otherwise would enable the owner of a distinctive, but yet highly useful, building to escape full property tax liability.' " *Dinner Bell* at 272, quoting *Fed. Res. Bank of Minneapolis v. State*, 313 N.W.2d 619, 623 (Minn.1981).

{¶ 52} Nonetheless, the court concluded that the appraiser had properly used the cost approach, because he had "simply considered the utility of the properties in conjunction with the highest and best use of the meatpacking facility." *Dinner Bell* at 272. The court then stated that the BTA had appropriately considered the appraiser's report because the record supported the conclusion that the appraiser's report "was a proper 'cost approach' appraisal, not a 'current use' appraisal as proscribed under the *Park Investment Co.* series of cases." *Id.*, citing *State ex rel. Park Inv.*, 175 Ohio St. 410, 195 N.E.2d 908. (Other citations omitted.) *See also Johnston Coca-Cola Bottling*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, at ¶ 14 (under *Dinner Bell*, the BTA may permissibly consider a property's present use).

{¶ 53} In *Johnston Coca-Cola Bottling*, the court stressed that the more pertinent question would be "whether the BTA considered the property's present-use value to the exclusion of other factors relevant to exchange value." *Id.* at ¶ 15. The court decided that this had not occurred in the case before it. In this regard, the court observed that both appraisers had concluded that the property's highest and best use "as improved" aligned with its current use, and that while "the BTA referred to the property's present use as a bottling facility, it did so in the context of deciding which comparables identified by the appraisers were 'more analogous' under the sales-comparison approach. * * * That determination fell within the BTA's discretion as fact-finder." (Citations omitted.) *Id.* at

¶ 16.

{¶ 54} This is similar to what occurred in the case before us. As was indicated, even though Sprout commented that the definition of a special-purpose property would apply to the subject property, he did not use a special-purpose property approach. He did note that the property's existing use "as a national fast food restaurant represents the maximum profitability to the property as improved," and that "[t]he most profitable use of the site 'as vacant' would be for a national single tenant user." Ex. A, p. 17; BTA Hearing, p. 133. However, this is not inconsistent with Weis's analysis. Weis's approach was similar, but slightly more narrow, as he stated that the highest and best use of the property would be continuing to use it as a restaurant or free-standing restaurant building. Logix Appraisal, p. 25; BTA Hearing, p. 16.

{¶ 55} In addition, the BTA did not use a special purpose approach in valuing the property. Therefore, the BTA did not err in considering how the property was currently being used in connection with its decision on the property's highest and best use, and in evaluating which comparables were more appropriate.

{¶ 56} In *Rite Aid*, the Supreme Court of Ohio commented that:

One crucial element in determining the value of property in the overall market lies in the concept of "highest and best use." "Highest and best use," according to the International Association of Assessing Officers ("IAAO"), "is that use which will generate the highest net return to the property over a reasonable period of time." IAAO, *Property Assessment Valuation* 31 (2d Ed.1996). Valuing a property at its highest and best use means identifying the "reasonably probable and legal use of vacant land or

an improved property that is legally permissible, physically possible, appropriately supported, financially feasible, and that *results in the highest value.*" (Emphasis added.) Appraisal Institute, *The Appraisal of Real Estate 278* (13th Ed.2008).

*Rite Aid*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177, at ¶ 34.

{¶ 57} The court went on to explain in *Rite Aid* that:

Highest and best use of the improvements to the land will usually be expressed in terms of the *general* type of use to be made of such property. In this case for example, a "retail store" might be the highest and best use, and since it is currently in that use, the appraisal report might say: "continued use as a retail store." That is in essence what both appraisal reports say in this case. By contrast, in the special-purpose situation one would expect to see: "continued use by the current occupant in its ongoing business."

(Emphasis sic.) *Rite Aid* at ¶ 35.

{¶ 58} In contrast to the special-purpose description discussed in *Rite Aid,* Sprout did not base his valuation on the continued use of the property by McDonald's in its ongoing business. Both Weis and Sprout concluded that the highest and best use of the subject property was as a restaurant. The fact that Sprout added "fast-food" to the description is not the same as stating that the highest and best use would be by McDonald's in its ongoing business. Indeed, none of the comparable properties that Sprout used were McDonald's restaurants.

{¶ 59} Furthermore, we see no problem with the fact that Sprout used some

comparable sales and leases of properties located in other counties. As an initial point, Sprout indicated that when he looked at comparable sales, he focused on fly-by traffic, demographics from the neighborhood, access and visibility, and similar uses in the market area. According to his testimony and report, the comparable properties had characteristics and markets similar to those of the subject property.

{¶ 60} Furthermore, Sprout did use comparable sales of properties in Montgomery County: a Skyline Chili on Miller Lane in Dayton, Ohio, and a Chipotle in Englewood, Ohio. Sprout also compared an Arby's that had been sold in Springfield, Ohio. The ultimate value assessed for the subject property ($425-$450 per square foot) was very close to the value of the Skyline and Arby's properties ($436 and $399), after some adjustments. The value was also considerably lower than the value assessed to the Englewood property ($633 per square foot). McDonald's does not suggest why these properties were inappropriate for comparison.

{¶ 61} Furthermore, Sprout placed primary weight on his income approach, in which four of the eight properties used were located in Montgomery County and a fifth property was located in Springfield, Ohio. Thus, the majority of the properties were in the same geographic area as the subject property. Of all the properties used in the income approach, the amount per square foot ($38) assessed to the subject property was most similar to two Montgomery County properties (a Chipotle in Englewood and a Wendy's in Huber Heights). Again, McDonald's does not say why these properties were inappropriate for comparison.

{¶ 62} As to any issue with Sprout's use of qualitative standards, the BTA has previously held that "qualitative, rather than quantitative adjustments, are recognized

standard appraisal practice." *Insite Wooster, LLC, v. Wayne County Bd. of Revision*, BTA No. 2014-4149, 2015 WL 11005090, *4 (Sept. 11, 2015), citing *Bd. of Edn. of the Columbus City Schools v. Franklin Cty. Bd. of Revision*, BTA No. 2014-2022, 2015 WL 1048721 (Feb. 27, 2015). In the case before us, the BTA specifically referenced the *Columbus City Schools* decision for this proposition, and also rejected McDonald's criticism of the fact that Sprout used qualitative adjustments as opposed to the quantitative adjustments Weis applied in his report. *See* BTA Decision and Order, at p. 4.

**{¶ 63}** McDonald's does not explain exactly what was allegedly wrong with Sprout's qualitative adjustments, other than that they were subjective. We disagree. Having reviewed the record in its entirety, we find nothing subjective about Sprout's adjustments. Both experts testified about their process of making adjustments and they applied similar factors, like location, size, and so forth, to adjust the price per square foot of the properties. As an example, Weis testified that he made an upward adjustment of 5% in the value of the McDonald's property because one of the comparable properties was in an "inferior" submarket. He did not explain why that submarket was inferior, nor did he indicate why a 5% figure, rather than some other amount, was used. BTA Hearing, p. 24.

**{¶ 64}** As a similar example, Sprout testified that one sales comparable (No. 6), which was valued at $399.29 (rounded to $400) per square foot, was in an inferior market. *Id.* at p. 137. Sprout did not assign a particular percentage to this adjustment, but ultimately valued the subject property at between $25 and $50 more per square foot than No. 6. This is a difference of between about 5.88% and 11.11%, and the percentage of

difference also includes other downward and upward adjustments for economic period of sale, superior land ratios, building size, and lease rate. *See* Ex. A, pp. 28-29. Again, we fail to see the distinction between the two methods of analysis. In other words, neither method was more or less "subjective" than the other.

{¶ 65} Notably, the BTA has stressed its frequent acknowledgement "that the appraisal of real property is not an exact science, but is instead an opinion, the reliability of which depends upon the basic competence, skill and ability demonstrated by the appraiser." *Columbus City Schools*, BTA No. 2014-2022, 2015 WL 1048721, at *4, citing *Cyclops Corp. v. Richland Cty. Bd. of Revision*, BTA No. 1982-A-566 (May 30, 1985), unreported. *See also, e.g., Sinkula v. Lorain County Bd. of Revision*, BTA No. 2016-891, 2017 WL 1444031, *2 (Jan. 10, 2017) (also citing *Cyclops Corp.*).

{¶ 66} In this case, the BTA found Sprout's analysis more competent and probative, while also pointing out flaws in Weis's approach, and the record supports the BTA's decision. In view of the preceding discussion, Sprout did not commit a legal error or obvious factual mistake, nor did he fail to apply "professional judgment" in using qualitative, rather than quantitative factors. *See NWD 300 Spring*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, at ¶ 16.

{¶ 67} Concerning McDonald's criticism of Sprout's "sales-breakpoint" analysis, this relates to Sprout's discussion of the amount of sales ($2,700,000) needed to support a lease rate of $38 per square foot. *See* BTA Hearing, p. 142. In contrast to McDonald's claim that this is a flawed methodology with no objective basis, Sprout indicated that he obtained the sales number (which was based on six and one-half percent of gross sales) from discussions with franchisees of fast-food restaurants as to what

range of rent they could support. One such individual was a client of Sprout's, and that individual owned 14 Wendy's restaurants. *Id.* at pp. 185-186. When asked for other support for this type of analysis, Sprout responded as follows:

> Actually, when I – in property management, in discussions with property managers and when we're doing leases for restaurants, fast food and regular restaurants, in my review of multiple lease documents, you see that sales breakpoint is in a lot of those, so that's – that's why when I requested sales information with McDonald's, and it wasn't forthcoming, I made the assumption that the sales must have been higher than what my indications were.

*Id.* at p. 186.

{¶ 68} McDonald's could have presented information about its sales at the hearing if it wished to challenge Sprout's assumptions. However, no such information was presented. In fact, Weis (who said he had represented McDonald's in 15 tax appeals cases in 2014 alone) claimed that he had asked McDonald's several times for information on the terms of its ground leases and could "only recall on one occasion where I was able to get the information, but only half information if it's kept confidential * * *." BTA Hearing, p. 89. Accordingly, we reject McDonald's assertion that Weis's methodology was more appropriate and should have been used.

{¶ 69} As was noted, McDonald's' second argument is that Sprout's appraisal and analysis produced inconsistent results. In this regard, McDonald's relies on what it terms a "very interesting point" concerning the BTA's adoption of Sprout's report in four of five pending McDonald's tax appeals, but not in the fifth, which concerned a McDonald's

restaurant that was constructed in 1978 and was located in the Brookville, Ohio, area. McDonald's has attached a copy of this BTA decision to its brief, and contends that the BTA agreed with Sprout's analysis until the end of its decision, when it abruptly reversed course and adopted Weis's valuation. According to McDonald's, this indicates that Sprout's judgment and analysis were unreasonable, unreliable, and unsupported by probative evidence.

{¶ 70} We have reviewed the decision, which is reported as *Brookville Local Schools Bd. of Edn. v. Montgomery Cty. Bd. of Revision*, BTA No. 2016-325, 2017 WL 3034549 (July 6, 2017). Putting aside the difficulty of comparing factually different cases in the absence of a record, we note that McDonald's assertions are incorrect. In the first place, the BTA did not "agree" with either appraiser's opinion during its discussion; instead, the BTA simply outlined each appraiser's opinion on valuation. The BTA then acknowledged, as it said it had in many cases where competing appraisals are offered, "that inherent in the appraisal process is the fact that an appraiser must necessarily make a wide variety of subjective judgments in selecting the data to rely upon, effect adjustments deemed necessary to render such data usable, and interpret and evaluate the information gathered in forming an opinion." (Citations omitted.) *Id.* at *4.

{¶ 71} Furthermore, the factual distinction in the *Brookville* case relates to the undisputed fact that "the McDonald's restaurant sitused on the subject property was at the end of its economic life on the tax lien date" and was going to be demolished and replaced with a more modern restaurant. *Id.* While the BTA agreed with the Board of Education that the property was still being used by a first-generation user for the purpose for which the restaurant was built, the BTA concluded that the restaurant's age greatly

impacted its value. For that reason, the BTA used Weis's selection of comparable properties instead of Sprout's selection. *Id.*

**{¶ 72}** As noted*, Brookville* is factually different, and the BTA's adoption of Weis's selection of comparable properties did not mean that Sprout's methodology was inaccurate or inconsistent. As the BTA noted, these opinions necessarily involve some degree of subjectivity. In this vein, we note that in *Brookville Board of Edn.*, Weis provided a valuation of $662,000 for a McDonald's property that was built in 1978 and was scheduled to be demolished. *Id.* at *3. This value is quite close to the $760,000 value Weis gave the subject property, which was built in 2006. While this seems inconsistent, the record of the Brookville case is not before us. The point here is that appraisers make judgments based on the facts of each case, and those facts will differ. Accordingly, we find no merit to McDonald's claim that Sprout's methodology is inconsistent.

**{¶ 73}** Based on the preceding discussion, the BTA did not abuse its discretion by adopting the valuation found in Sprout's appraisal. The testimony and report by the BOE's appraiser presented no legal errors or obvious factual mistakes, and there is no indication of a failure to apply professional judgment. *NWD 300 Spring*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, at ¶ 16. And, as was noted, the evidence in the record supports the BTA's decision. McDonald's First and Second Assignments of Error, therefore, are overruled.

### III. Abuse of Discretion in Accepting BOE Appraisal

**{¶ 74}** McDonald's Third Assignment of Error states that:

The Board of Tax Appeals Acted Unreasonably and Unlawfully, and Abused Its Discretion, by Finding the Appraisal Analysis Submitted by Appellee Kettering City Schools Board of Education To Be More Competent and Probative Evidence of the Subject Property's Market Value Than the Appraisal Analysis Proffered by Appellant.

{¶ 75} In its brief, McDonald's does not discuss this assignment of error. Instead, McDonald's says only that if we agree with its first two assignments of error, we will not need to rule on this assignment of error. Since we have rejected the first two assignments of error, we would presumably need to address McDonald's Third Assignment of Error.

{¶ 76} However, we need not do so, because App. R.12(A)(2) provides that we "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." *See also, e.g.*, *Toms v. Ohio Unemp. Comp. Rev. Comm.*, 2d Dist. Clark No. 2007 CA 80, 2008-Ohio-4398, ¶ 12-13 (failure to argue errors could result in summary affirmance of trial court, but choosing to consider error in the interests of justice).

{¶ 77} Even if we chose to discuss this particular assignment of error, we would find it without merit, based on our discussion of the first two assignments of error. Specifically, we have already concluded that the BTA did not abuse its discretion in finding Sprout's appraisal more competent and probative than the appraisal of Weis. The evidence in the record supports the BTA's decision. Accordingly, the Third Assignment of Error is overruled.

IV.   Highest and Best Use of the Property

**{¶ 78}** McDonald's Fourth Assignment of Error states as follows:

The Board of Tax Appeals Acted Unreasonably and Unlawfully, and Abused Its Discretion, by Finding the Highest and Best Use Analysis Advanced by Appellee Kettering City Schools Board of Education More Appropriate Than the Analysis Proffered by Appellant.

**{¶ 79}** Under this assignment of error, McDonald's contends that the BTA's analysis contradicts Ohio Supreme Court precedent, past BTA precedent, and the BTA's own analysis within its decision.   In this regard, McDonald's makes two primary points: (1) the BTA's highest and best use conclusion was too narrow; and (2) the BTA ignored a nearly identical case that the Ohio Supreme Court decided last year (*Rite Aid*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177).

**{¶ 80}** As to the first point, we have already considered the special-purpose exception during our discussion of the first two assignments of error.   As was noted, neither Sprout nor the BTA appraised the property as a special-purpose property. Instead, the property's use was simply taken into consideration in evaluating the highest and best use for the property.   This was appropriate.   *See Dinner Bell*, 12 Ohio St.3d at 272, 466 N.E.2d 909; *Johnston Coca-Cola Bottling*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, ¶ 14-15 (BTA may permissibly consider a property's present use; it may not consider it "to the exclusion of other factors relevant to the exchange value"). Because the special-purpose exception was not used and the BTA did not consider the property's current use to the exclusion of other factors, McDonald's argument is not well-

taken.

{¶ 81} Furthermore, when the BTA agreed with Sprout's definition of "best and highest use," it did not effectively limit the subject property to a single user – McDonald's. As we noted, both appraisers found the highest and best use of the property to be a restaurant; Sprout's use was slightly more specific, by concluding that the highest and best use was as a fast-food restaurant. As we mentioned earlier, the Supreme Court observed in *Rite Aid* that in a special-purpose situation, one would expect to see a description limiting the use to " 'continued use by the current occupant in its ongoing business.' " *Rite Aid*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177, at ¶ 35. That was not the analysis used here.

{¶ 82} Moreover, McDonald's assertion in its brief that no other nationally-based fast-food restaurant like Wendy's or Burger King would ever purchase this McDonald's property unless it only wanted the land and intended to demolish the building, would logically weigh in favor of classifying the subject as a special purpose property, even though that was not done. For the same reasons, we disagree with McDonald's contention that the BTA's decision conflicts with the decision in *Rite Aid*. *Rite Aid* is also factually distinguishable and there is no conflict with that case.

{¶ 83} In *Rite Aid*, the Washington County Auditor appealed to the Supreme Court of Ohio from a BTA decision that had adopted Rite Aid's lesser valuation of a drugstore and parking lot. *Rite Aid*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177, at ¶ 1. The court noted that the parties had different approaches, with Rite Aid valuing the property by reviewing comparable properties that were for lease or sale in the geographic area, and not just as a drugstore, while the county had valued the property by looking " 'at

only drugstores for their * * * comparables scattered around the State of Ohio.' " *Id.* at ¶ 7. Under this description, the choice of valuing a property as a "restaurant" might as easily be challenged as valuing a property as a "fast-food restaurant."

{¶ 84} Rite Aid's sale comparables were also located in counties other than the county (Washington) in which the subject property resided, and were even in another state (West Virginia). *Id.* at ¶ 9 (noting sales comparables from Zanesville (Muskingum County); Nelsonville (Athens County); Parkersburg (West Virginia), and Vienna (West Virginia)). This belies McDonald's argument that sales comparables should be taken from the same county. Admittedly, the choice of the more distant locations may have been based on the fact that the Rite Aid drugstore was located in a rural area and there may have been a shortage of retail properties to compare. However, while the comparables that the BTA found less persuasive were from geographically distant areas, the BTA was more focused on the fact that the county's sales comparables "were drawn from larger urban areas of Ohio * * *." *Id.* at ¶ 16. Markets in larger urban areas would likely not compare to markets in rural areas, regardless of geographic proximity. In any event, these points are of little consequence here, because Sprout's analysis did use sales comparables from Montgomery County.

{¶ 85} In *Rite Aid*, the Supreme Court of Ohio also commented on a statement that the county's counsel had made during the BTA hearing. In response to a statement by Rite Aid, the county's counsel stressed that its expert had appraised " 'the property as it actually existed on the tax lien date *as a Rite Aid.*' (Emphasis added.)" *Rite Aid*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177, at ¶ 8. The court went on to note that "[i]n other words, the county posits a valuation in terms of continued use by Rite Aid *even*

*after a putative sale*, presumably with the drugstore continuing as lessee under a long-term lease. As counsel stated, this does resemble the existing use as of the lien date; but it also differs from the manner in which the property was held on the lien date because this property – unlike all of [the county appraiser's] comparables – was not subject to a lease." (Emphasis sic.). *Id.*

{¶ 86} Unlike the appraiser in *Rite Aid*, Sprout did not value the subject property as continuing to operate as a McDonald's after a putative sale; instead, Sprout valued the property as operating as a fast-food restaurant after a putative sale. More importantly, Sprout made adjustments for the fact that the comparable properties were subject to leases. As an example, Sprout adjusted one of the sales comparables in Montgomery County (the Skyline Chili), which sold in June 2014 for $436.47 per square foot, and had an existing five-year lease. Ex. A, p. 21. Sprout made adjustments for the inferior physical features of this property and its greater age. He also adjusted all the sale comparables based on their lease rates as compared to what the subject property could achieve. Ex. A, p. 29. Ultimately, as was noted above, the subject property was given a value of $425-$450 per square foot.

{¶ 87} This type of adjustment is something the county's appraiser in *Rite* Aid failed to do. The Supreme Court of Ohio stressed this fact, noting that *"[a]ll* [the comparables] were apparently encumbered by leases at the time of sale – in other words, they were sold subject to long-term leases. The leases were said to be 'at approximately market terms.' The appraisal report then states: 'As the subject is being valued based upon market terms, *no adjustments were required.'* " (Emphasis sic.) *Rite Aid* at ¶ 10.

{¶ 88} In this regard, the court also rejected the county's contention that the sale

price of encumbered parcels should not be adjusted in deciding the value of unencumbered parcels. *Id.* at ¶ 19. The court found this argument illogical, commenting that "[p]recisely because the lease affects the sale price and value, the leased-fee comparable ought to be adjusted when the subject property has no lease; the adjustment would remove the effect of the lease on the sale price so that the sale can indicate what the unencumbered subject property would sell for." *Id.* at ¶ 20, citing *Steak 'n Shake, Inc. v. Warren Cty. Bd. of Revision*, 145 Ohio St.3d 244, 2015-Ohio-4836, 48 N.E.3d 535, ¶ 36. Again, unlike the appraiser in *Rite Aid,* Sprout did make adjustments to reflect the fact that the subject property was unencumbered.

{¶ 89} Based on the preceding discussion, the Fourth Assignment of Error is overruled.

## V. Consideration of "Present Use"

{¶ 90} McDonald's Fifth Assignment of Error states that:

> The Board of Tax Appeals Acted Unreasonably and Unlawfully, and Abused Its Discretion, in Considering the Present Use of the Subject Property in Determining Its Market Value.

{¶ 91} Under this assignment of error, McDonald's contends that the BTA erred by applying the holding in *Johnston Coca-Cola Bottling*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503. McDonald's concedes the holding in *Johnson Coca-Cola* that the present use of a building may be considered in determining true value for tax purposes in proper cases. However, McDonald's contends that there are no special circumstances that have been identified concerning this "rather ordinary McDonald's restaurant that

would cause it to escape fair taxation * * *." McDonald's Brief, p. 15.

**{¶ 92}** We have already discussed the ability of appraisers to consider the present use of a property when considering a property's highest and best use, and need not consider it further. However, we again point out the inconsistency of McDonald's positions. In its reply brief, McDonald's states that:

> If the subject property were truly worth what the BOE's appraiser claims, one has to ask, why was the BOE unable to present a single sale of a vacant McDonald's restaurant at a sales price at or near to the claimed value of the subject property? The reason why is that when McDonald's or any of its competitors leave a site, the building is virtually worthless.

McDonald's Reply Brief, p. 3.

**{¶ 93}** If a building has no worth except as it is currently being used, that would seem to fit the definition of a special-purpose building. *See Consol. Aluminum Corp. v. Bd. of Revision of Monroe Cty.*, 10th Dist. Franklin No. 84AP-756, 1985 WL 9890, *5 (Mar. 7, 1985) (appraisers defined special-purpose property as "property which could not be converted to other uses without expending substantial sums of money"). We also note the similar comment in Weis's report, when he discussed the highest and best use of the subject property: "Since improvements contribute value over/above the value of the land and an alternative use would not be cost effective as a conversion of the property would require substantial capital, the Highest and Best Use of the subject As It Existed, was as a Restaurant." Logix Appraisal, p. 25.

**{¶ 94}** Based on the preceding discussion, the Fifth Assignment of Error is overruled.

VI.   Use of Capitalization Rate

{¶ 95} McDonald's Sixth Assignment of Error states as follows:

The Board of Tax Appeals Acted Unreasonably and Unlawfully, and Abused Its Discretion, in Finding the Capitalization Rate Advanced by Appellee Board of Education of the Kettering City Schools, Rather Than the Rate Adopted by Appellant, More Appropriate to Use in Calculating the Subject Property's Market Value Under the Income Capitalization Approach to Value.

{¶ 96} Under this assignment of error, McDonald's argues that the BTA abused its discretion in choosing Sprout's cap rate of 7.00% over the rate used by Weis (8.25%, plus a .17% tax additur, or 8.42%).   In its decision, the BTA faulted Weis's appraisal in general because he had selected dissimilar properties to compare to the subject property.   The BTA then stated that:

In addition, Weis's capitalization rate raises concerns given that it was derived from properties that were dissimilar to the subject properties, i.e., retail, instead of restaurant or fast-food restaurant properties.   As such, we cannot confirm that his capitalization rate appropriately captures the market in which the subject property would operate.   However, Sprout's capitalization rate was based upon fast-food restaurants, and, therefore reflective of the subject property's most likely use.

BTA Order and Decision, p. 4.

{¶ 97} "An overall capitalization rate is defined as 'an income rate for a total

property that reflects the relationship between a single year's net operating income expectancy and the total property price or value; it is used to convert net operating income into an indication of overall property value.' The Appraisal of Real Estate (10 Ed.1992) 415. An overall capitalization rate is 'adopted' from relevant market data, when possible, by taking known market values of comparable properties and dividing the net operating income for each comparable property by its market value. From these calculations, a range of overall capitalization rates can be established as an indication of risk. An overall capitalization rate increases with greater risk associated with a parcel of property, providing a lower market value for that property given a net operating income." *312 Walnut Ltd. Partnership v. Hamilton Cty. Aud.*, 1st Dist. Hamilton No. C-960236, 1996 WL 733150, *2 (Dec. 24, 1996).

**{¶ 98}** According to McDonald's, the BTA incorrectly rejected Weis's cap rate because 10 of the 32 properties used in his analysis of cap rates were restaurants and of those 10, nine were fast-food restaurants. McDonald's also notes that Weis considered cap rates reported in several surveys from a website.

**{¶ 99}** As a preliminary matter, Weis, himself, described the highest and best use of the property as a restaurant. Even if one accepts that broad characterization, this does not explain why more than two-thirds of Weis's market-derived cap rates for purposes of a "direct comparison" are from general retail properties. Many of these properties bear no relationship to a restaurant; quite a few also have significant amounts of square footage (24,000 to 40,000 square feet) and appear to be strip malls. The 32 properties are also located in 10 different Ohio counties, several of which (Lake, Cuyahoga, Lorain, Fayette, and Franklin) are quite distant from Montgomery County.

{¶ 100} In contrast, Sprout used sales of seven fast-food restaurants to compare market-derived local rates. Three of these restaurants were in the Dayton area (the Englewood Chipotle, the Miller Lane Skyway Chili, and the Arby's restaurant in Springfield, Ohio). The cap rates of all seven properties ranged between 5.45% and 6.77%. Instead of using one of these lower numbers, Sprout consulted a national publication for the typical cap rates in the lease market for the first quarter of 2014. This indicated a range between 6.00% and 8.50%.

{¶ 101} Sprout also stated that location is a factor in cap rates, although the tenant and lease term may also be an influence. As an example, he noted that the Skyline Chili on Miller Lane had a 6.77% cap rate, even though the remaining lease term was only 5 years. He indicated that the buyer thought the location was so good that if Skyline vacated, someone else would come in and take its place for a similar rent.

{¶ 102} After looking at all the data, Sprout estimated a rate of 7.00% for the subject property. This was without even considering that McDonald's is considered the "gold standard" in terms of credit-worthiness – which would have decreased the risk.

{¶ 103} Based on the preceding discussion, the evidence in the record contains reliable and probative evidence supporting the BTA's factual findings, and there is also evidence to support the BTA's decisions on what weight to give the evidence. *Dublin City Schools Bd. of Edn.*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, at ¶ 13; *Terraza 8*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, at ¶ 7.

{¶ 104} As a final matter, we note that McDonald's makes statements in its brief that are not accurate. For example, McDonald's criticizes the BTA for accepting Sprout's investment analysis because it came from discussions with unidentified local banks, while

Weis provided a chart that could be verified on a website. While Sprout did discuss rates with local banks, he also had information on cap rates for actual sales and consulted a national real estate publication that indicated cap rates within the net lease market. Sprout included a copy of the survey in the addendum to his report. Thus, Sprout did not simply obtain information from discussions with local banks. As noted, the charts that Weis references in his report include overall cap rates obtained from a website. Logix Appraisal, pp. 43-44. Thus, both appraisers consulted outside sources, and the fact that Weis included a "chart" in his report is irrelevant.

{¶ 105} McDonald's also contends that if Weis had used only the cap rates for his restaurants or fast-food survey (presumably the website survey), his total value conclusion would have been even lower. Since Weis did not explain these surveys in his report or testimony, it is unclear what any difference might be. According to McDonald's, Weis felt a more accurate cap rate would include general retail, even though that mean a higher value for the subject property. McDonald's Brief, p. 17. McDonald's also contends that the BTA could simply have used the cap rate of 8.57% for the fast food restaurants that Weis did include in his survey. Since Weis adjusted that amount to 8.25%, the basis for advocating that the BTA should have used a higher amount than Weis did is unclear. The purpose of retaining experts who conduct appraisals is to assist with valuation.

{¶ 106} Furthermore, as was noted, many of the 32 properties were located in distant areas. In addition, no information was presented about the particulars of any of these properties. Weis indicated that looking at location and demographics are typically more than he does to estimate cap rates. This may be true for his mode of analysis, but

there is no reason why the BTA was required to accept it.

{¶ 107} As was noted, the record contains reliable and probative evidence to support the BTA's decision, and the BTA did not act arbitrarily, irrationally, or unconscionably in using Sprout's analysis. Accordingly, McDonald's Fifth Assignment of Error is without merit and is overruled.

VII. Use of Expert Witness

{¶ 108} McDonald's Seventh Assignment of Error states as follows:

The Board of Tax Appeals Acted Unreasonably and Unlawfully, and Abused Its Discretion, in Continuing to Recognize Appellee Kettering City Schools Board of Education's Appraiser as an Expert Witness in View of the Testimony and Evidence Proffered at the BTA Hearing.

{¶ 109} Under this assignment of error, McDonald's contends that the BTA unreasonably dismissed McDonald's attempts to impeach Sprout during cross-examination and in post-hearing briefs. According to McDonald's, the BTA improperly consolidated these concerns and concluded they were without merit because Sprout had been recognized as an expert. McDonald's fails to point to a place in the record where the BTA made such a statement, and we find no indication of that fact.

{¶ 110} As was noted, Weis testified first, because the BOR failed to record Weis's testimony. The BOE stipulated to Weis's qualifications as an expert. BTA Hearing, pp. 9-10. After Weis finished testifying, the BOE called Sprout to testify. At that time, when the BOE asked for a stipulation as to Sprout's qualifications, McDonald's counsel questioned Sprout about his affiliation with Barnes & Company. Sprout indicated he was

not an employee, but was affiliated with Barnes as a subcontractor. The following exchange then occurred:

Mr. Bluestone: Okay. I will stipulate to Mr. Sprout's qualifications with a caveat, I believe that there – I continue to believe that there is a disingenuous statement on Page 9 of the appraisal report, specifically that the – at the bottom of the page under Competency it says "The appraiser(s)" – the "s" in apostrophe – in parentheses – "have been actively involved in the appraisal of real estate in the Central Ohio area for over 30 years," et. cetera.

As I noted in a prior case before you, Miss Higgins, that statement, if you give effect to the "s" in the parentheses, that statement is not true, and cannot be true for many, many years because only Mr. Barnes has 30 years' experience as an appraiser. Mr. Sprout does not, and I think it's a misleading and disingenuous statement. So, with that caveat, I will stipulate to his qualifications.

Attorney Examiner Higgins: Okay. Well, just so the record is clear, this Board has recognized Mr. Sprout as an expert – as an expert qualified to render their property value. I don't see any reason why the Board should deviate from that, so the Board will recognize him as an expert.

BTA Hearing, pp. 124-125.[5]

{¶ 111} The examiner's statement did not prohibit McDonald's from impeaching

---

[5] Sprout had been appraising property since 1995 or 1996, and had been a licensed appraiser since 2001. Brian Barnes, who also signed the appraisal report, had been a certified appraiser since 1972.

Sprout's credibility or cross-examining him; the statement simply recognized that Sprout was qualified to render opinions as an expert. We have reviewed the entire transcript, and McDonald's was given a full opportunity to cross-examine Sprout during the hearing, and did so. *Id.* at pp. 150-200. After Sprout testified, Weis was recalled and provided his specific criticisms of Sprout's report. *Id.* at pp. 215-234.

**{¶ 112}** There were no other statements by the BTA hearing examiner about Sprout's qualifications during the hearing, except that at the end of the hearing, the examiner admitted Sprout's report, as she had done previously with Weis's report. *Id.* at p. 245. McDonald's attorney then renewed his prior objection, and the hearing examiner overruled the objection, noting that the BTA would "afford Sprout's appraisal reports their due weight." *Id.*

**{¶ 113}** In the merit brief that McDonald's filed after the hearing, McDonald's again raised the same issue regarding the competency statement in the appraisal report and classified the representations as to Sprout's experience as "misleading" and "patently false." McDonald's Merit Brief, p. 4. McDonald's also raised what it termed a "troubling new issue," based on Sprout's testimony – that Sprout had created a false impression, because Barnes played no part in determining the subject property's value despite having signed the report. *Id.* at p. 5. However, this incorrectly characterized the testimony. Sprout testified that he had prepared the appraisal report, and that Barnes's "involvement was quality control and just an advisory situation." BTA Hearing, p. 126. Immediately after making this statement, Sprout added, "The determination of values were mine and mine alone." *Id.* However, Sprout also stated that Barnes would have reviewed the report before signing it. *Id.* at p. 127.

**{¶ 114}** In its merit brief, McDonald's also attempted to introduce statements from a different case that were not part of the record and had not been discussed during the hearing. *See* McDonald's Merit Brief, p. 4 and fn. 9 (referring to testimony from BTA Case No. 2015-2357).

**{¶ 115}** In its decision, the BTA commented that:

We note that, at this Board's hearing and through written argument, the property owner attempted to impugn Sprout's qualifications and claimed that he misled this board about his qualifications. As noted at this board's hearing, this argument lacks merit, and, therefore, we recognize Sprout as an expert qualified to render an opinion on the subject property's value.

BTA Decision and Order, p. 4.

**{¶ 116}** Again, this is not a statement that Sprout's expert opinion or credibility could not be challenged; it is simply a statement that Sprout was recognized as an expert who could render an opinion. Deciding " 'the probative value of an appraiser's testimony lies within the competence of the BTA.' " *BT Property LLC v. Franklin Cty. Bd. of Revision*, 10th Dist. No. 16AP-449, 2017-Ohio-2769, 90 N.E.3d 360, ¶ 29, quoting *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, ¶ 20 (and refusing to reweigh evidence). (Other citations omitted.)

**{¶ 117}** Furthermore, the comments in the BTA's decision are well-supported by the record. Both at the hearing and in briefing, McDonald's did attempt to impugn Sprout's character and credibility without a basis for doing so. McDonald's has not provided any authority indicating that the appraisal procedures used in this case were unethical. One would assume that more than one party might be involved in an appraisal

or in reviewing the appraisal before it is sent to a client. For example, Weis's report indicated that he is the president of Logix Real Estate Solutions. His letter to McDonald's indicates that "[a]t your request, *we* have made an appraisal investigation [of the Stroop Road McDonald's] * * *." (Emphasis added.) Whether Weis was referring to both himself and the company as "we" is unclear, but in describing the assumptions used, Weis also stated that "the appraisers have used the following Hypothetical Conditions: None." Logix Appraisal, p.5.

{¶ 118} The plural references indicate that perhaps more than one person prepared or assisted in preparing Weis's the report or reviewing it for quality. Whether that is the case or not, it appears inconsequential, particularly since McDonald's has not presented any authority indicating that involving more than one party in an appraisal is inappropriate, or that some kind of professional violation occurs when a party does a quality review of an appraisal and signs the report. The fact is that the BTA was correct in its assessment of McDonald's tactics.

{¶ 119} Accordingly, the Seventh Assignment of Error is without merit.


VIII. Conclusion

{¶ 120} All of McDonald's assignments of error having been overruled, the judgment of the BTA is affirmed.


. . . . . . . . . . . . .


FROELICH, J. and HALL, J., concur.

Copies mailed to:

Mark H. Gillis
Karol C. Fox
Charles L. Bluestone
Patrick J. Heery
Adam M. Laugle
Joseph W. Testa, Ohio Tax Commissioner